**In re PMS ASSOCIATES NO. 2, Debtor.**

**In re DORCHESTER GARDENS COMPANY, Debtor.**

**Bankruptcy Nos. IP89–2810RA V, IP88–6701RA V.**

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

July 27, 1989.

Robert A. Goldstein, Dennis S Meir, Kilpatrick & Cody, Atlanta, Ga., Charles E. Greer, Kevin Dempsey, Ice Miller Donadio & Ryan, Indianapolis, Ind., for Home Sav.

Mary Titsworth, Thomas Dinwiddie, Wooden McLaughlin & Sterner, Indianapolis, Ind., for Dorchester Gardens.

James Kowalik, Gary Hostetler, Hostetler & Kowalik, Indianapolis, Ind., Kurtzman & Haspel, Nanuet, N.Y., for PMS Associates.

## ORDER GRANTING RELIEF FROM STAY

RICHARD W. VANDIVIER, Bankruptcy Judge.

This matter comes before the Court on the motions for relief from stay filed on April 14, 1989 in IP 88–6701 and on May 10, 1989 in IP 89–2810, by Home Savings of America, F.A. ("HSA"). A hearing was held on June 20, 1989. The Court now grants these motions on the following findings of fact and conclusions of law.

### Findings of Fact

1. Dorchester Gardens Company ("Dorchester") and PMS Associates No. 2 ("PMS") are both limited partnerships each having as its principal asset an apartment complex in Indianapolis, Indiana. Dorchester owns the Cedar Apartments ("Cedars") and PMS owns the Seven Trails West Apartments ("Seven Trails").

2. HSA is a creditor of Dorchester under $4,250.000.00, variable rate, 30 year loan, on which was owing an amount in excess of $5,061,000.00 at the date of bankruptcy filing. HSA is a creditor of PMS under a $6,000,000.00, variable rate, 30 year loan, on which was owing an amount in excess of $7,653,000 at the date of bankruptcy filing. These debts are secured by first priority, perfected security interests in each of the apartment complexes and in leases and rents associated with the complexes.

3. Dorchester has been in default on its debt to HSA since late 1986. Dorchester

filed for relief in bankruptcy in the Northern District of California in 1988 to forestall foreclosure on Cedars by HSA, but the case was later dismissed. On October 18, 1988, Dorchester filed its second Chapter 11 petition, in this Court, to forestall foreclosure.

4. To forestall foreclosure on Seven Trails, PMS filed for Chapter 11 relief in the Northern District of California in July, 1988, and venue was later transferred to this district.

5. After HSA moved for adequate protection, the Court approved a cash collateral order in each case to which HSA and the Debtors consented. The orders allowed the Debtors to use the cash collateral, pay certain specified types of operating expenses as they became due, and pay a management fee on not more than 5 percent. Remaining funds were to be turned over monthly to HSA. According to the orders, the Debtors were to maintain funds derived from the complexes in separate accounts, such funds were not to be commingled with other funds, no payments to insiders, except the management fee, were to be made, and the Debtors were to provide HSA with monthly reports of funds collected and disbursed.

6. The Debtors failed to abide by the cash collateral orders in that they did not maintain separate DIP accounts, they commingled funds received from the complexes with funds from at least eleven other entities, they made unauthorized expenditures, they did not pay the specified types of operating expenses as they became due, they failed to make timely monthly reports and payments to HSA, and some of the checks to HSA were not honored by the bank. Additionally, it became known that Patrick Crowe, the general partner of the Debtors and a principal of Bennett–Crowe Management, Inc. ("Bennett–Crowe"), which was managing the Debtors, has several felony convictions. HSA moved for appointment of a trustee, and Paul Gresk was so appointed in the Dorchester case on March 20, 1989, and in the PMS case on June 6, 1989.

7. There have been undoubted, serious defaults and mismanagement before and since each Debtor filed for relief, but those problems can be rectified by a competent, operating trustee, which each Debtor now has. The most significant factual issue now is whether there is any prospect for effective reorganization for either Debtor.

8. At the time of the bankruptcy filings, the Debtors were controlled by their general partner Alan Sternberg ("Sternberg"), who was then replaced by Patrick Crowe. The Debtors intend to replace Mr. Crowe, but have not come forward with a commitment from anyone. In the past two years, the complexes have been managed by four different management companies.

9. According to the appraisals presented by HSA at the hearing, Cedars has a value of $3,200,000.00 and Seven Trails has a value of $6,000,000.00. Both are anticipated to appreciate about 15 percent over the next ten years. The Debtors presented no evidence regarding the value of the complexes. There is no dispute that HSA's claims are undersecured.

10. According to on-site property managers, the occupancy rate of Seven Trails is approximately 90 percent and of Cedars is approximately 87 percent. Rents are at about market rate, but there have been discounts or specials given to increase occupancy. The complexes are in fair condition, with some maintenance and repairs needed, including replacement of all the roofs at Cedars. Most of the appliances in the apartments are past their expected useful lives and are replaced when needed. The complexes are slow in paying their bills and some checks have been returned for insufficient funds. The electric power to the common areas at Seven Trails was briefly turned off for nonpayment.

11. Mr. Robert A. Weiner ("Weiner"), a Certified Public Accountant specializing in insolvency retained by HSA, and Brian McMerty ("McMerty"), Bennett–Crowe's controller since January, 1989, provided the bulk of the testimony on the financial condition and prospects of the Debtors. The Court found Weiner to be the more competent and credible witness on these issues.

12. As of the date of the hearing, Dorchester owed real estate taxes in excess of $399,000.00 and PMS owed real estate taxes in excess of $267,000.00. No real estate taxes have been paid for at least two and one-half years by either Debtor. There are past due postpetition payables of at least $33,000.00 for Dorchester and at least $54,000.00 for PMS.

13. According to Monthly Cash Flow Summaries prepared from Bennett–Crowe Cash Flow Reports from October 20, 1988, through April, 1989, Cedars had an average monthly income of $62,920.05, an average monthly operating expense of $36,930.31, for an average net operating income of $25,989.74. According to such summary of reports from September, 1988, through May, 1988, Seven Trails had an average monthly income of $111,782.67, an average monthly operating expense of $54,989.52, for an average net operating income of $56,793.17. The net operating income is figured before debt service and without allowing for real estate taxes. The cash flow reports themselves tend to overstate income because they do not show some expenses, including taxes, that were left unpaid, but the summaries do provide some historical data to determine whether there is any prospect for the complexes to generate enough income for reorganization.

14. Mr. McMerty prepared cash flow projections for the complexes for 1989, 1990, and 1991, showing income, operating expenses (including real estate taxes), and debt service to HSA. According to those projections, in 1989 Cedars will have a net operating income before debt service of $465,316.00, or $38,776.33 per month. This is almost $13,000.00 more per month than the recent historical figures, without property tax payments. Even with these optimistic projections, after allowing for debt service of $466,000.00, the projections show negative "free cash flow" in 1989 ($684.00) and 1990 ($448.00), and a positive flow of just $13,519.00 in 1991.

15. According to Mr. McMerty's projections for Seven Trails, in 1989 there will be a net operating income before debt service of $812,501.00, or $67,708.42 per month. This is almost $11,000.00 more per month than the recent historical figures, without property tax payments. The projections allow a debt service of $739,000.00 per year and show a free cash flow of $73,501.00 in 1989, $76,571.00 in 1990, and $101,089.00 in 1991.

16. Mr. McMerty conceded that the complexes have yet to come close to his income projections and that expenses have exceeded his projections. The Court finds no basis in the evidence to conclude that Mr. McMerty's optimistic projections have any chance of being realized. The trustee testified that the income generated by the complexes is insufficient to service the debts at the current levels.

17. On the day of the hearing, PMS filed a proposed plan of reorganization, and Mr. McMerty stated that Dorchester would file a similar one soon (although it has not yet been filed). The proposed plan calls for payment in full, as of the effective date of the plan, of administrative claims and of priority tax, wage, benefits and security deposit claims. Mr. McMerty stated that he had not calculated how much cash would be needed as of the effective date of the plan. The Court notes that back real estate taxes and past due post-petition administrative expenses would be at least $432,000.00 for Dorchester and at least $321,000.00 for PMS. In addition, the plan calls for cash payment of 10 percent on most general unsecured claims (including the unsecured portion of HSA's claim) in three installments within 18 months of the effective date of the plan. Even Mr. McMerty's income figures would not allow for payment of such amounts any time soon. The plan states that if revenue is insufficient, the general partner will make his best efforts to obtain additional financing either through requesting additional capital from the partners or through bonds or other debt instruments.

### Conclusions of Law

1. The Court has jurisdiction over this matter. 28 U.S.C. section 157(b)(2)(G).

2. On request from a party in interest and after notice and a hearing, a

court may grant relief from the automatic stay—

. . . .

(2) with respect to a stay of an act against property ..., if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. section 362(d). Once a movant under 11 U.S.C. section 362(d)(2) establishes that it is an undersecured creditor, it is the burden of the debtor to establish that the property is necessary for an effective reorganization. *See* 11 U.S.C. section 362(g); *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). This requires not just a showing that if there is conceivably to be an effective reorganization, that property would be needed for it, but that the property is essential for an effective reorganization *"that is in prospect." Id.* (emphasis in original). This means that there must be a reasonable possibility of a successful reorganization within a reasonable time. *Id.*

3. It is uncontested that the Debtors have no equity in their respective apartment complexes. It is undoubted that those complexes would be necessary to any reorganization. The question is whether the Debtors have met their burden of establishing that effective reorganization is in prospect. The Court concludes that the Debtors have failed to present sufficient, credible evidence that there is a reasonable possibility of successful reorganization within a reasonable time.

4. The Debtors' cash flow projections are unrealistically optimistic, but even they not support a reorganization of the type envisioned by the plan proposed by PMS. The likelihood of the plan's proposal that additional financing might be obtained from the partners or through bonds or debt instruments is unsupported by any evidence. The Debtors are having difficulty in replacing Crowe as general partner, as contemplated by the plan. The plan appears to violate the absolute priority rule, assuming this would be a cramdown, in that junior claimants, i.e. the limited partners, would retain their interests while more senior claimants are not paid in full. *See* 11 U.S.C. section 1129(b)(2)(B). Although the Court will not subject the proposed plan to the same degree of scrutiny that would be appropriate at a confirmation hearing, the plan was obviously filed in part in support of the Debtors' contention that effective reorganization is indeed in prospect. As such, the plan fails.

5. The proposed plan aside, the Court concludes that there is no reasonable possibility that the Debtors could propose any confirmable plan, short of liquidation. In particular, the Court concludes that there is no realistic possibility that the Debtors could pay priority claims, including the past due real estate taxes and the administrative expenses, in the manner required by 11 U.S.C. section 1129(a)(9).

6. The Court concludes that HSA is entitled to relief from stay in both cases.

Judgment will be entered separately.