**In re NORTHPORT MARINA ASSOCIATES, Debtor.**

**Bankruptcy No. 091–71609–21.**

United States Bankruptcy Court,
E.D. New York.

Jan. 9, 1992.

Platzer, Fineberg & Swergold by Sidney G. Platzer, Spitzer & Feldman by M. James Spitzer, Jr., New York City, for debtor.

Robinson, St. John & Wayne by David H. Stein, New York City, for Citibank, N.A.

Epstein, Becker & Green, P.C. by Daniel R. Wotman, New York City, for North Unity.

Thelen, Marrin, Johnson & Bridges by Daniel L. Saxe, New York City, for Cashman.

Scott Stuart, E.D.N.Y., Garden City, N.Y., Office of the U.S. Trustee.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Pending before the Court are several motions in this voluntary Chapter 11 proceeding.

Citibank, N.A. ("Citibank"), the Debtor's principal secured creditor, has filed the following motions:

(a) Motion for entry of an order granting relief from the automatic stay pursuant to 11 U.S.C. § 362 for the purposes of (1) allowing Citibank to foreclose on certain real property owned by Northport Marina Associates ("Northport" or "Debtor") and to exercise all of Citibank's rights under the law and its mortgages; and (2) granting Citibank further relief including a dismissal of the instant Chapter 11 proceeding; and

(b) Motion seeking dismissal of the Chapter 11 proceeding or in the alternative appointment of a trustee under 11 U.S.C. § 1104.

Northport, a New York general partnership, has filed a cross-motion pursuant to Section 552 of the Bankruptcy Code seeking an order confirming that its income is not subject to a pre-petition security interest of Citibank, that Citibank has not perfected its purported security interest in the 'rents' and 'general intangibles' of the Debtor, and that its income is not cash collateral.

Voluminous affidavits have been submitted in support of these various motions.

The Court also heard testimony thereon on October 18 and October 23, 1991.

For the reasons more fully set forth below, Citibank's motion for relief from stay is granted; its motions for dismissal of the instant Chapter 11 proceeding and for appointment of a trustee are denied. The debtor's cross-motion will be separately considered and decided in an Opinion to follow.

## FACTS

On July 19, 1991, the Debtor filed a petition in the Eastern District of New York seeking relief under 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code"). The Debtor remains in possession of its estate pursuant to Sections 1107 and 1108 of the Bankruptcy Code and no trustee has been appointed.

### The Business of the Debtor

The Debtor owns and operates a marina and recreational complex located in the Village of Northport, Long Island, New York (the "Subject Property"), a waterfront community on Long Island Sound. The Subject Property constitutes substantially all of the assets of the Debtor and is essential for the successful maintenance of its business.

The property consists of 310 boat slips bordered by floating docks, two buildings, sun decks, a swimming pool, and two tennis courts. When completed, the facilities building will include a lounge area, exercise rooms, cabanas, a sauna, snack bar, locker rooms and storage areas. There is also a retail complex. The property also includes an open boat display and storage area and onsite parking for 324 cars. Until 1991 the Subject Property was undergoing construction and is now entering into its first year of full operation.

The Subject Property was intended to be operated as a "dockominium." The boat slips would then not be leased but would be sold; each dockominium unit would comprise a boat slip, and its purchaser would also own a percentage of the common interest in various other amenities. The Debtor

had filed an offering plan with the Attorney General's Office to obtain authorization to sell dock space. On the filing of an amended current financial statement with the Attorney General's Office, it will have authority to commence marketing. No marketing has yet taken place.

Until the property is used as a dockominium, and at the present time, the Subject Property, which is known as the Britannia Yacht and Racquet Club is engaged in renting boat slips. It has entered into 93 contracts for the coming season as compared with 38 at the same time last year.

### Citibank's Interest

The development was financed by Citibank beginning December 29, 1986. Through a series of notes and mortgages, Citibank funded the development and construction of the Subject Property for a total principal amount of $18,136,527.

One of the loan documents executed between December 29, 1986 and June 30, 1988 is a Mortgage Modification Agreement dated October 27, 1988. This Agreement modifies the outstanding mortgages to include the terms of Exhibit B. Exhibit B is captioned "Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement." The "Granting Clause" of this Exhibit reads in part:

> [T]he Mortgagor ... hereby gives, grants, bargains, sells, warrants, aliens, remises, releases, conveys, assigns, transfers, mortgages, hypothecates, deposits, creates a security interest in, pledges, sets over and confirms unto the Mortgagee all of its estate, right, title and interest in ... all of the following described property ... whether now owned or held or hereafter acquired:
>
>    *    *    *    *    *    *
>
> (d) the Intangibles;
>
> (f) all leases of *all* or any portion of the Mortgaged Property now or hereafter entered into and all right, title and interest of the Mortgagor thereunder, including, without limitation, any cash or securities deposited thereunder, to secure performance by the lessees of their obligations thereunder,

whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right, upon the happening of an Event of Default, to receive and collect the *rents* thereunder; ...

Exhibit C–6, pp. 2–3.

The Mortgage Modification Agreement further provides:

> During the continuance of any such Event of Default ... the Mortgagee shall be entitled to collect and receive all *earnings, revenues, rents,* issues, profits and *income* of the Mortgaged Property, and every part thereof, all of which shall for all purposes constitute property of the Mortgagor; and in furtherance of such right the Mortgagee may collect the *rents* payable under all leases of the Premises directly from the lessees thereunder upon notice to each such lessee that an Event of Default exists hereunder accompanied by a demand on each such lessee for the payment to the Mortgagee of all rents due and to become due under its lease....

Exhibit C–6, p. 18 (emphasis supplied).

At the same time, Citibank filed a UCC financing statement which claims a security interest in "[a]ssignment of rents, condemnation awards, hazard insurance proceeds and all fixtures, furnishings, fittings, appliances, appurtenances, equipment, machinery, boilers, building materials, oil burners, power systems, air conditioning units, elevators, chattels and articles of personal property ..." (Rider to Exhibit C–11). It does not claim a security interest in accounts receivables, licenses, permits, intangibles or in the proceeds derived therefrom. (Exhibit C–11).

The Debtor defaulted under its various notes and mortgages on September 1, 1990 and has made no payments to Citibank since that date.

In November 1990 the Debtor brought suit against Citibank in the Supreme Court of the State of New York for money dam-

ages and other relief, claiming that Citibank had improperly and without foundation declared the Debtor in default and refused to make additional funds available to the Debtor. It has been stipulated that this Supreme Court action, in which no discovery has as yet taken place, will be discontinued and an adversary proceeding will be brought in this Court. It is the Debtor's intention in this proceeding to have Citibank's claim equitably subordinated to the claims of the Debtor's other creditors.

On May 6, 1991, Citibank filed a complaint in the Supreme Court of the State of New York against Northport for foreclosure of mortgage; it also requested the appointment of a receiver to collect rents, but it does not appear that such a receiver was ever appointed before the action was stayed by the filing on July 19, 1991 of a Chapter 11 petition by the Debtor. Citibank is moving to lift the stay so that it can continue the foreclosure proceeding.

Citibank and the Debtor have agreed and stipulated that as of the date the Debtor filed it owed Citibank principal and accrued interest of $19,746,210.08. In addition, Citibank claims to be owed $1,626,111.20, comprised of interest from November 7, 1990, penalties and legal fees. Northport claims to have an offset against the debt owed to Citibank based on the allegations in the lender liability lawsuit filed in November 1990.

Northport Holding Corporation has a junior purchase money mortgage on the Subject Property in the principal amount of $5 million. J.M. Cashman, Inc. claims a mechanic's lien in the amount of $387,745.00, which was vacated after being bonded by Northport's principals.

Unpaid real estate taxes on the Subject Property total $346,281. Northport has initiated certiorari proceedings contesting these taxes. The taxes are based on a valuation substantially higher than Citibank now places on the property.

As of the date the petition was filed, general unsecured creditors (not including the unsecured portion of the debts owed to Citibank and Northport Holding Corp.) were owed $442,582.

On July 25, 1991, Citibank filed with the Clerk of this Court a Notice of Security Interest and a Demand for Segregation of Cash Collateral and Objection to Use of Cash Collateral pursuant to 11 U.S.C. § 546(b).

Thereafter, two cash collateral Orders were entered by this Court. One allowed the Debtor to use cash collateral in an amount not to exceed $5,000 and the other authorized a similar amount, but not to exceed $10,000. The Orders gave Citibank a super-priority, post-petition replacement lien on all assets of the Debtor to the extent of the Debtor's use of its cash pursuant to these Orders.

Since the Debtor filed, it has been renting out boat slips for the coming summer season. The Debtor also provides wet winter storage.

### The Rental Agreements

The "Winter Storage and Service Agreement" covers the period from November 15th to April 1st and calls for payment dependent on the length of the boat. The agreement reads in part:

> When a boat enters the Marina for winter storage, whether inside or out, dry or wet, slip rental, sale or for any other purpose, it shall be located where ordered, moved and maneuvered in the Marina's sole discretion. The Marina may move the boat from location to location at its sole discretion at any time. The Marina may also move any boat to a location off the Marina's property at its sole discretion.

The corresponding warm weather agreement is entitled "Slip Rental Service and Membership Agreement." It covers the season from May 1st to October 31st. Under the agreement, slip space or dinghy dockage is rented at so much per lineal foot. The number of the slip which is rented is designated on the agreement. One of its provisions reads:

> When a boat enters the Marina for any reason, whether by land or water, it shall be located where ordered, moved and ma-

neuvered at the Marina's sole discretion. The marina, or its designee, may move the boat from location to location at its sole discretion at any time. In the event of a violation of this agreement by Owner, the Marina, or its designee, may move any boat to a location off the Marina's property at its sole discretion, provided however, that the Marina shall be adequately insured.

The agreement also provides:

... if an Owner expects to have his boat out of a slip overnight or longer, he shall notify the Marina in advance as to his estimated time of return, to insure that his slip will be vacant upon his return. The Marina reserves the right to sell, rent, occupy or use any vacant slip or storage area, and the Marina shall be entitled to all proceeds of any such use or rental.

All members are granted the right to use all the facilities of the complex and to obtain all available services. The Debtor furnishes persons renting slips various services, including security, assistance in loading or unloading groceries, supplies and personal property, boat maintenance and repair, and the services of a boat master and dock attendant.

A customer signing an agreement for marine storage or rental receives various services, but does not obtain the exclusive right to any particular area and in the event he violates the agreement, the Marina may cancel all agreements on three days notice and the owner must remove his boat from the marina.

If the premises were operated as a dockominium, customers would buy a specific slip rather than being subjected to having their boat moved for the convenience of the Marina or having their slip occupied by a transient boat.

### The Hearing

Citibank rested after the debtor stipulated that Citibank's various mortgage loan agreements were valid, that its financing statement had been filed with the Suffolk County Clerk, that as of the petition date it owed at least $19 million to Citibank, and that the debtor had no equity in its property. Citibank filed in support of its motion an appraisal of the Subject Property by Bradley & Company, Appraisers, Inc. (the "Bradley Appraisal") showing the value of the Subject Property as of October 1, 1991 to be $9,950,000. The Debtor did not concede the value set forth in the appraisal, but conceded that it had no equity in the Subject Property.

Northport, in opposition to Citibank's motion and in support of its cross-motion, called Gerald Y. Mordfin, CPA, a member of the accounting firm which has served as Debtor's accountant since it was organized; Peter Houmere, part owner and operator of Marina Concepts and Management, Inc., which is responsible for operating and maintaining the Subject Property, negotiating rental agreements for slip usage and for the upland buildings which are listed on the Debtor's schedules; and M. James Spitzer, Jr., Esq., Debtor's pre-petition general counsel.

Mr. Mordfin's testimony laid the foundation for the introduction of an exhibit projecting the Debtor's cash flow for the period November 1, 1991 through October 31, 1992. According to his projection, the net cash flow for that period would be $912,446.

This projection assumes (1) that real estate taxes for the period November 1, 1991 through October 31, 1992 will be reduced to $150,000 a year as a result of the certiorari proceedings, and (2) that the Debtor's upland buildings, although now partially vacant, will be fully rented. The space now rented would realize rental income of $59,905 by October 31, 1992; Mr. Mordfin projects rental income of $184,820. Rental of those buildings has been impeded by a zoning controversy with the Village of Northport.

Mr. Mordfin's projection of anticipated slip rental is not predicated on historical data because this is the first year the entire reconstructed marina facility is available for use. Ongoing construction made it unavailable in earlier years. An earlier draft of the same document prepared by Mr.

Mordfin was less optimistic in its conclusions, projecting a cash flow less by $91,-981, or 10%. Moreover, Mr. Mordfin's projection for 1992 is higher than that in the Bradley Appraisal, which projects cash flow (after real estate taxes of $325,100) of $659,100 for 1992.

If Mr. Mordfin's projection of cash flow were realized, there would be enough money to pay Citibank's interest at the contract rate on the secured portion of its debt, $9,950,000, with interest estimated to be approximately $900,000 per year.

Certain items of income could properly have been included in Mr. Mordfin's projections, but were not, such as recovery of electric costs from users and water charges. Likewise, transient income was understated and upland summer storage charges were not included. On the other hand, Mr. Mordfin's projections are predicated on a rental of $110 per linear foot, although repeat customers pay only $105 a foot and most of the agreements already signed are with repeat customers.

Mr. Houmere testified that of the 310 boat slips at the subject property, 93 (later corrected to 99) have been contracted for, as compared to 32 at the same time last year. Wet storage agreements total 118 as compared to 53 the prior season. The marina is drawing customers from other areas. Rentals are continually increasing. Boat storage is expected to increase to between 270 and 290. However, no docks are being sold because the debtor's offering plan requires amendment.

Mr. Spitzer, the Debtor's former general counsel, was responsible for preparing the "Britannia Yacht and Racquet Club Condominium Offering Plan" covering the proposed dockominiums filed with the New York State Attorney General's Office. Based on the offering plan, the completed sale of all slips would produce $31 million and result in an income stream to the Debtor. All that is required in order to commence marketing the docks is the filing of an amended current financial statement with the Attorney General. Mr. Spitzer testified that partners and shareholders of the partners have the financial ability to

infuse capital into the Debtor and are considering doing so to fund a plan of reorganization. An investment company is also interested in participating in the Debtor's venture.

The Debtor is currently self-sustaining. The Debtor's operating report for the month ending September 30, 1991 showed that the Debtor had accumulated a cash reserve in excess of $100,000 from its operations from the date of filing this Chapter 11 proceeding. As stated earlier, however, the Debtor has made no payments to Citibank since September, 1990.

## DISCUSSION

*Citibank's Motion For Relief From Stay*

Although Citibank's motion invoked Section 362(d)(1), Citibank has conceded that it is relying solely on Section 362(d)(2). Section 362(d)(2) authorizes relief from the automatic stay with respect to a stay of an act against property if two conditions are met: (a) the debtor does not have an equity in the property; and (b) such property is not necessary to an effective reorganization.

The Debtor conceded that it has no equity in the subject property. Therefore, it was its burden to demonstrate that the property is "necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). It is not enough that without the subject property there can be no reorganization. For the Debtor to carry its burden, it needed to show "that the property is essential for an effective reorganization *that is in prospect.*" *In re United Sav. Assoc. v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) (emphasis in original). What the Debtor was required to demonstrate was the reasonable possibility of a successful reorganization within a reasonable period of time. *Ibid.; In re Canal Place Ltd. Partnership,* 921 F.2d 569, 577 (5th Cir. 1991); *In re PMS Assoc. No. 2,* 104 B.R. 86, 89 (Bankr.S.D.Ind.1989).

The Debtor did not carry that burden by pointing to the fact that its Chapter 11 petition had been filed only a month

before Citibank sought relief from stay. Indeed, it is not an overstatement to say that the Debtor left the record a blank respecting how it plans to reorganize.

It is true, as the Debtor argues, that a request for relief from stay should not be transformed into a thorough inquiry into the feasibility of a plan which has yet to be proposed, (see *In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 111 (Bankr.W.D.Tex.1987); *In re Grand Sports, Inc.*, 86 B.R. 971 (Bankr.N.D.Ind. 1988)), but some plan must be *in prospect*. In this case, the Debtor furnished not even a hint as to how it will be able to reorganize. All it proved was that if certain premises are indulged and all events break in Debtor's favor, that it is able to reduce its taxes, overcome the Village of Northport's opposition to the commercial use it is planning to make of its upland property and then find tenants for the vacant space, it will just be able to cover its expenses and pay interest on its debt to Citibank drastically reduced to current value. But that alone will not permit it to reorganize. When does it plan to amortize its debt to Citibank so as to meet the requirement that a plan be "fair and equitable"? *In re D & F Constr., Inc.*, 865 F.2d 673 (5th Cir.1989). How does it plan to pay the fees of professionals, the Debtor's own attorney, the attorneys for the Creditors' Committee now being formed, which as administrative expenses take priority? What does it plan to do about the $5 million debt to the Northport Holding Corporation? What about the claims of its general creditors, of $442,582? How is it going to pay the unpaid real estate taxes, even at a reduced level, which take priority?

Accepting the Debtor's formulation that it need "only demonstrate through evidence that a reorganization could be possible" (Debtor's Proposed Findings of Fact and Conclusions of Law, p. 20), where is that evidence? In the case from which the Debtor derives that formulation, *In re Grand Sports, Inc.*, 86 B.R. 971 (Bankr. N.D.Ind.1988), the Court undertook to calculate what the debtor's income would be if the debtor's predictions were borne out and

after concluding that it would take the debtor ninety years to amortize the debt owed to its secured creditor, granted relief from the stay on the ground that the debtor would be unable to propose a confirmable plan.

The evidence in this case is on a par with that *In re Grand Sports, Inc., supra.* All the Debtor has shown is that in the present market, if its taxes are reduced, its zoning dispute with the Village of Northport resolved in its favor and its commercial property leased, it will be able to generate enough income to service its debt to Citibank. However, more is required for Northport to be able to reorganize. The fact that the principals of the Debtor are capable and would under proper circumstance infuse capital to effect a plan, is meaningless unless one is also advised of the nature of the plan of reorganization which their capital will facilitate. Furthermore, what a lawyer, Mr. Spitzer, testifies as to what someone else might be willing to do scarcely demonstrates "an effective reorganization that is in prospect." At the least, one of these potential investors should have testified.

Nor does the Debtor discharge its burden of proof by pointing to the fact that its property would have significantly more value as a dockominium than as a rental property and that based upon the offering plan sales of its slips as dockominiums would yield $31 million and generate an income stream to the Debtor. No one testified that sales of slips in the present depressed market is possible. The Bradley Appraisal pointed out all the reasons why it is not: the steady drop in boat sales, the depressed economy of Suffolk County, the lack of local demand for dockominiums. The Debtor does not carry its burden of establishing the feasibility of an effective reorganization by proof that if economic conditions were different, reorganization would be possible.

In this case, the fact that the request for relief from stay comes close on the filing under Chapter 11 and within the 120 day period during which the Debtor has the exclusive right to file a plan does not ex-

plain the Debtor's total failure to carry its burden, since the necessity for devising some plan of reorganization has been facing the Debtor since it stopped making mortgage payments to Citibank in September 1990. It knew then that unless it wanted to lose its property to foreclosure, that it would have to come up with a plan of reorganization to salvage its property in Chapter 11. Thus, it has had over a year in which to devise such a plan, yet it has been unable to come up with anything.

No matter how liberally the Court evaluates the Debtor's evidence, zero remains zero. Citibank is entitled to relief from stay because the Debtor has failed to carry its burden of proof under 11 U.S.C. § 362(g)(2). The case the Debtor presented appears to have been planned to demonstrate that Citibank has adequate protection and thus is not entitled to relief under 363(d)(1), but that is not the test under 363(d)(2). Further, proof that adequate protection may exist is no substitute for proof that there is a reasonable possibility of a successful reorganization within a reasonable period of time.

### Citibank's Motion to Dismiss

■ Because Citibank has asked for dismissal on the ground that the petition was not filed in good faith, it is necessary to address that contention briefly. It is true that many of the factors which the courts have emphasized in finding lack of good faith are present here, such as the fact that this is essentially a two party dispute involving a single asset. Nevertheless, the test is not a mechanical one to be resolved by checking off items on a laundry list; what is called for is an in-depth examination of the Debtor's purpose: did the Debtor file its petition without the ability or reasonable expectation of reorganization. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). In this case the Debtor was confronted with a true emergency. The Debtor was not speculating in real estate, but rather lost its financing at a crucial stage in the construction and found its problems compounded by the great change in the local economy, particularly in pleasure boating. Were it able to

carry out its plans to build a dockominium and were the economy to change a reorganization might well have proved feasible. Even at the present time, a plan of reorganization appears feasible if new money can be found. Therefore, it cannot be found that filing under Chapter 11 was simply a device to buy time and not made with the intention of reorganizing. Therefore, Citibank's motion to dismiss must be denied.

### Citibank's Motion for Appointment of a Trustee

■ Little time need be spent on Citibank's motion to appoint a trustee pursuant to 11 U.S.C. § 1104. No serious effort has been made by Citibank to produce any evidence that would justify the appointment of a trustee. Citibank has shown no cause. No evidence has been adduced of fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management now or at any time.

### CONCLUSIONS OF LAW

This is a core proceeding over which this Court has jurisdiction of the subject matter and parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (G), (K).

The Debtor has no equity in its real property in which Citibank has a security interest and the Debtor has not carried its burden of proving that such property is necessary to an effective reorganization which is in prospect. Therefore, Citibank is entitled to relief from stay so that it may continue with its foreclosure proceeding with respect to such property.

Settle Order in accordance with the foregoing Opinion.