**EDGEWATER WALK APARTMENTS, an Illinois Limited Partnership, Debtor–Appellant,**

v.

**MONY LIFE INSURANCE COMPANY OF AMERICA, Appellee.**

No. 93 C 3612.

United States District Court, N.D. Illinois, E.D.

Dec. 10, 1993.

Joel H. Shapiro, Kamenear, Kadison & Anderson and Lawrence Jay Weiner, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL, for debtor-appellant.

David Perry Leibowitz, Steven Michael Hartmann and Michael P. O'Neil, Freeborn & Peters, Chicago, IL, for appellee.

### AMENDED MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Debtor Edgewater Walk Apartments has appealed a bankruptcy court order granting a motion by mortgagee MONY Life Insurance Company of America ("MONY") to modify the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code. Bankruptcy court orders granting relief from the automatic stay are final and appealable. *Matter of Boomgarden,* 780 F.2d 657, 660 (7th Cir.1985) (citing *In re Am. Mariner Indus.,* 734 F.2d 426, 429 (9th Cir.1984)). We have authority to review the order pursuant to 28 U.S.C. § 158(a).

#### Background

Debtor–Appellant is an Illinois limited partnership whose principal asset is the beneficial ownership of a 192–unit apartment complex located in Tinley Park, Illinois ("Phase I" or the "Property"). (Edgewater Exh. 12.) Debtor's sole partners are Terry and Valerie Davis. (Stmt. of Fin. Affairs at ¶ 19.) Debtor has no employees.

Appellee MONY holds a first real estate lien, evidenced by a Mortgage Deed and Security Agreement ("Mortgage"), against the Property. (MONY Exh. 1 & 2.) MONY also holds an assignment of rents derived from the Property under an Assignment of Lessor's Interest in Leases ("Assignment of Leases"). (MONY Exh. 3.) The Mortgage and Assignment of Leases secure Debtor's obligations under a Note dated June 20, 1986. (MONY Exh. 1.) The initial principal amount of the Note was $5.7 million. (*Id.*)

Under the terms of the Mortgage, Debtor is responsible for payment of real estate taxes due on the Property. (MONY Exh. 2 at ¶ 2.) Debtor was required to escrow funds for payment of such taxes. (MONY

Exh. 2 at ¶ 4.) Under the terms of the Mortgage, Debtor's failure to pay real estate taxes when due triggers MONY's right to accelerate the remaining principal due under the Note plus any accrued interest. (MONY Exh. 2 at ¶ 4.)

There are two mortgages on the Property in addition to the one held by MONY. David Tillinghast ("Tillinghast") holds a second mortgage on the Property and a second assignment of rents securing an outstanding loan of $1.15 million.[1] Thrush Bond Investors, L.P. ("Thrush") holds a third mortgage on the Property and a third assignment of rents securing an outstanding principal balance of $1.0 million.[2] These mortgages were acquired by Thrush and Tillinghast during March 1993.

The Property is presently managed by T.A.D. Associates, Inc. ("TAD"). (Edgewater Exh. 1 & 13.) TAD is primarily owned by Terry Davis. A ten percent interest in TAD is held by Tillinghast. (Tr. of Bankr. Ct. Hr'g of March 30, April 1, 14, 15, 16, 23, May 6, 7, 1993, at 854, *Mony Life Ins. Co. of Am. v. Edgewater Walk Apts. (In re Edgewater Walk Apts., Ltd.,* No. 92 B 22023 (Bankr.N.D.Ill.) (Sonderby, J.) (hereafter, "Tr.").)

The genesis of Debtor's current predicament was its failure to pay the real estate taxes due on the Property for 1987 through 1991. According to the Trial Stipulation filed in connection with the state court foreclosure proceeding, MONY redeemed the 1987 and 1988 real estate taxes on the Property after they were purchased by a third party at a tax sale by advancing $741,872.95 in December 1990. (*Mony Life Ins. Co. of Am. v. Chicago Title and Trust Co.,* No. 91 CH 4374 (Cir.Ct. of Cook County, Ill., Sept. 23, 1992)

(O'Brien, J.), Trial Stip. at ¶ 5.) In January–March, 1993, MONY paid an additional $1,070,334.76 for 1989, 1990, and 1991 real estate taxes on the Property that had been purchased and/or paid by third parties. (Joint Pre-trial Stmt., C.L. Dkt. 57–A, Stmt. of Uncontested Facts at ¶ 33; MONY Exh. 39 & 41.)[3]

On March 19, 1991, MONY sent Debtor a notice of default for Debtor's nonpayment of the real estate taxes due for 1987 through 1990. (MONY Exh. 5.) MONY filed a Complaint to Foreclose Mortgage in the Circuit Court of Cook County on May 10, 1991. (*Mony Life Ins. Co. of Am. v. Chicago Title and Trust Co.,* No. 91 CH 4374 (Cir.Ct. of Cook Co., Ill. May 10, 1991) (O'Brien, J.).) MONY's petition for foreclosure was granted on September 23, 1992. (MONY Exh. 13.) Debtor voluntarily filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on October 2, 1992, thereby staying entry of the decree of foreclosure. (Voluntary Petition, *In re Edgewater Walk Apts., L.P.,* No. 92 B 22023 (Bankr.N.D.Ill. Oct. 2, 1992).)

MONY filed a secured claim for $6,401,-114.37 on March 13, 1993.[4] (MONY Exh. 6 at 1.) MONY also filed a post-petition claim of $1,567,414.34 for post-petition interest, post-petition advances for the 1989, 1990, and 1991 real estate taxes on the Property, and post-petition attorneys' fees, costs, and expenses. (*Id.* at 2.)

Debtor did not file a plan during the 120-day exclusivity period granted to Debtor by the Bankruptcy Code, (see 11 U.S.C. § 1121(b) (1993)). (See 11 U.S.C. § 1121(d)

---

1. The second mortgage was originally granted in June 1987 in favor of Heritage Bremen Bank ("Heritage"). (MONY Exh. 53 & 54.) Tillinghast purchased the claim post-petition from ITC Financial Services, Heritage's assignee. (*See* Sch. D to Vol. Petition.)

2. Home Federal Savings Association of Kansas City ("Home Federal") was the original holder of the third mortgage and third assignment of rents. (MONY Exh. 55 & 56.) As of the petition date, the third mortgage and third assignment of rents were held by the Resolution Trust Corporation (the "RTC"), as the receiver of Home Federal.

(Sch. D to Vol. Petition.) Thrush purchased the mortgage post-petition from the RTC.

3. As a result of these payments, MONY holds additional claims against Debtor's bankruptcy estate totaling $1,812,207.61.

4. The amount represents the sum of the outstanding principal on MONY's loan to Debtor, the balance of funds advanced to redeem the 1987 and 1988 real estate taxes, and unpaid pre-petition interest on both amounts.

(1993).) To date, Debtor has not filed a plan of reorganization.[5]

■ MONY filed its motion for relief from the automatic stay pursuant to section 362(d)(2) of the Code on January 19, 1993.[6] (MONY Life Insurance Company of America's Motion to Dismiss or Modify the Automatic Stay, *Mony Life Ins. Co. of Am. v. Edgewater Walk Apts.* (*In re Edgewater Walk Apts., Ltd.*), No. 92 B. 22023 (Bankr. N.D.Ill. Jan. 19, 1993).) MONY requested that the bankruptcy court dismiss Debtor's case pursuant to section 1112(b) of the Bankruptcy Code on the ground that the bankruptcy petition was filed in bad faith.[7] (*Id.*) MONY requested alternatively that the court modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code to permit MONY to proceed with the foreclosure action that had been pending in the Circuit Court of Cook County when Debtor sought protection under the Bankruptcy Code. (*Id.*)

The bankruptcy court held a hearing on May 14, 1993, three and one-half months after the expiration of the exclusivity period, to address MONY's motion. The bankruptcy court refused to dismiss the case. The court found that Debtor made a good faith showing that it intended to reorganize the Property and rejected MONY's argument that the timing of Debtor's bankruptcy filing evidenced an intent to delay MONY's attempt to enforce its rights as a secured creditor. (Tr. of May 14, 1993 Bankr.Ct. Hr'g at 5, *Mony v. Edgewater*, No. 92 B 22023 (Bankr.N.D.Ill. May 14, 1993) (Sonderby, J.) (hereafter "Hr'g").) MONY has not appealed that finding.[8]

The bankruptcy court did find, however, that both elements of section 362(d)(2) were satisfied and thus granted MONY's motion to modify the automatic stay.[9] (*Id.* at 24.) The court found that MONY met its burden of showing that the Debtor had no equity in the property by showing that the undisputed portion of MONY's prepetition claim far exceeded the property's fair market value, which the court found to be $5.6 million.[10] (*Id.* at 15.) The court then found that al-

---

5. Debtor's failure to file a plan prior to the expiration of the exclusivity period—or prior to the bankruptcy court's hearing on MONY's motion to lift the automatic stay—is not fatal to its position opposing such motion. As we discuss below, the relevant inquiry with respect to a motion to lift the stay under section 362(d)(2) is whether " 'there is a reasonable possibility of a successful reorganization within a reasonable time.' " *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) (quoting *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 370–71 (5th Cir.1988)).

6. The exclusivity period expired on January 29, 1993, 120 days after the filing of Debtor's petition.

7. Section 1112(b) provides that

[O]n request of a party in interest . . . and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interests of the creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of any reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors; . . .

11 U.S.C. § 1112(b) (1993).

8. Prior to addressing the motion to modify the automatic stay, the bankruptcy court denied MONY's motion requesting that the court draw an inference that Debtor's failure to produce financial records for the years of 1987 through 1990 was evidence that those financial records would support MONY's case. (*Id.*) That ruling has not been appealed and is not before this Court.

9. Section 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

. . . .

(2) with respect to a stay of an act against property under subsection (a) of this section if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

(11 U.S.C. § 362(d)(2) (1993).)

The party requesting relief from the automatic stay under section 362(d) has the burden of proof on the issue of the debtor's interest in the property; the party opposing relief has the burden of proof as to all other issues. (11 U.S.C. § 362(g) (1993).)

10. Debtor does not challenge this finding.

though the property was necessary for reorganization, Debtor had failed to show that reorganization was feasible. (*Id.* at 16, 18.) Because Debtor challenges numerous findings by the bankruptcy court that relate to its feasibility finding, the court's analysis is set out in some detail here.

According to the bankruptcy court, Debtor was required to make two showings to defeat MONY's motion to modify the automatic stay.

> To show that the property is necessary for an effective reorganization the debtor bears the burden of proof of establishing; [sic] one, that the property is necessary to its reorganization efforts; and two, there's a reasonable possibility of a successful reorganization within a reasonable time.

(*Id.* at 16 (citing *In re 8th Street Village Ltd. Partnership*, 88 B.R. 853 (Bankr.N.D.Ill.), *as affirmed by* 94 B.R. 993 (N.D.Ill.1988)).) The court then identified the series of factors to be used in assessing the probability of a successful reorganization:

> A, whether the lender's allowed secured claim that [sic] can realistically be valued and paid over time with a discount factor equal to the market rate of interest from the debtor's net operating income generated by its property; B, whether some other means of proposing a confirmable plan are realistically contemplated, like new capital contributions; and, finally, C, whether debtors are moving meaningfully to propose a plan of reorganization.

(*Id.* at 18 (citing *In re Ashgrove Apts. of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr.S.D. Ohio 1990)).)

In applying these factors, the court focused on the two reorganization plans proposed by debtor in its pretrial statement, one that maintained the Property as rental apartments, and one that assumed the Property was converted into condominiums.[11] (*Id.* at 19.) The bankruptcy court found that the reorganization plan that relied on operating the Property as rental apartments "promis[es] more than the debtor can possibly deliver." (*Id.* at 22.) The court commented that

> [a]fter seven months into [the] bankruptcy the debtor's proposal is little more than conjecture. The debtor filed its bankruptcy petition over 7 months ago and has yet to invest the resources necessary to transform this proposal into a concrete attempt at reorganization.

(*Id.* at 19–20.)

The bankruptcy court made numerous factual findings in support of its conclusions regarding the rental-based plan. It found that the proposed interest rate "fails to approximate a market rate of interest for this type of property." (*Id.* at 20.) It found that the proposed plan failed to include any significant cash infusion to cover administrative expenses or fund capital improvements.[12] (*Id.*) Finally, it found that the income and expense projections on which the plan was based were not realistic.[13] (*Id.* at 21–22.)

---

**11.** Under the rental-based plan, the Property will continue to operate as rental apartments. (*Id.*) MONY will receive monthly payments from the rental income. (*Id.*) The principal balance remaining at the end of seven years will be refinanced. (*Id.*) The second and third mortgagees will subordinate their claims to those of the other unsecured creditors, whose claims will be paid in full within a seven year period following plan confirmation. (*Id.*) The second plan contemplates basically the same terms, except that the Property will be converted into condominium units and MONY will be repaid earlier from condominium sale proceeds. (*Id.* at 22.)

**12.** The court noted that a proposed $200,000 cash infusion from David Tillinghast was both insufficient to cover likely administrative expenses and necessary capital improvements *and* contained contingencies that would be unacceptable to MONY. The court expressed the concern that MONY would derail the proposed reorganization because MONY's willingness to approve of the plan depended on its faith in Debtor's management team and MONY had no faith in the management company Debtor proposed to retain under the plan. (The bankruptcy court stated at the hearing that "Substantial management corporation's affiliation with TAD is not likely to be any more acceptable." (*Id.*) We assume that the court meant to refer to "Suburban Management Corporation," the management company formed by Terry Davis that Debtor proposes as the successor to TAD in the management of the Property.)

**13.** The bankruptcy court noted that its efforts to assess Debtor's projections were hampered by the fact that Debtor provided no evidence of the Property's operating results for the 1987–1990 period other than its tax returns. (*Id.*) Debtor

The bankruptcy court concluded that Debtor's second alternative—the condominium conversion—likewise was not an "'effective reorganization that is in prospect.'" (*Id.* at 23 (quoting *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988)).) The court noted that none of the "substantial work [that] must be done prior to securing financing for any such conversion" had been done, despite the fact that Debtor had contemplated the possibility of such conversion since 1991. The court also expressed doubts as to the viability of the conversion:

> [A]n overwhelming amount of evidence shows there is a substantial risk associated with any condominium conversion that debtor has not adequately addressed. Specifically the debtor has obtained no commitments for funding an eventual conversion. The $200,000 cash infusion is insufficient absent additional commitments to loan funds. Additionally the debtor has not had an absorption survey completed to determine whether this area is viable for such condominium conversion at the prices anticipated by the debtor.
>
> Finally, the owner of the third mortgage compiled an analysis on a condo conversion project and found that such a project would not be advisable given the conversion of [other apartments in a related development], which is already underway. In essence converting [the Property] at this time would flood the market with condominiums. Based upon the record the court finds that the debtor is no closer to formulating a plan than it was 7 months ago when it filed its petition.

(*Id.* at 23–24.) The bankruptcy court concluded that Debtor had failed to meet its burden of showing that there was an effective reorganization in prospect and granted MONY's motion.

Debtor filed a Notice of Appeal on May 26, 1993. The Bankruptcy Court denied Debtor's Emergency Motion for Stay Pending Appeal on May 27, 1993. Debtor then sought a stay from this Court. The Court granted Debtor's Emergency Motion for Stay Pending Appeal on June 23, 1993.

### Discussion

Debtor raises numerous issues in its appeal of the bankruptcy court's decision to modify the automatic stay to allow MONY to foreclose on the Property. Debtor argues that the bankruptcy court erroneously based its decision on matters that should be confined to a confirmation hearing. (Appellant's Br. at 15.) Debtor also challenges a number of the bankruptcy court's factual findings. Because Debtor raises the issue of the appropriate standard of review, the Court addresses that question before proceeding to the merits.

According to Debtor, the bankruptcy court's analysis is subject to *de novo* review. (Appellant's Br. at 15, 19.) Debtor argues that such standard is appropriate because the bankruptcy court misapplied the applicable legal standard "by basing its decision to lift the stay on matters which should have been reserved to a hearing on confirmation." (Appellant's Br. at 19.) In its reply brief, Debtor cites *Osborne v. Production Credit Ass'n of River Falls, Wisconsin,* 42 B.R. 988 (W.D.Wisc.1984) in support of it position. (Appellant's Reply Br. at 3.)

 To the extent that Debtor is arguing that the bankruptcy court's ultimate decision to lift the stay is subject to *de novo* review, Debtor's position is contrary to the law in this Circuit. "Because 11 U.S.C. § 362(d) commits the decision of whether to lift the stay to the discretion of the bankruptcy judge, his decision may be overturned only upon a showing of abuse of discretion." (*Matter of Boomgarden,* 780 F.2d 657, 660 (7th Cir.1985) (citing *In re Holtkamp,* 669 F.2d 505, 507 (7th Cir.1982)); *see also In re 8th Street Village Ltd. Partnership,* 94 B.R. 993, 995 (N.D.Ill.1988) (citing *Boomgarden,* 780 F.2d at 663).) Debtor has not cited, nor has the Court identified, any Seventh Circuit case applying a different standard of review to orders lifting the automatic stay. Thus,

---

allegedly was unable to provide other financial records because some of them had been "inadvertently mishandl[ed] and damage[ed]" when the room in which they had been stored flooded, and others had been lost or destroyed in a management transition. (*Id.* at 8–9.)

the Court holds that the appropriate standard of review is abuse of discretion.[14]

■ Under an abuse of discretion standard, this Court's role is limited. The decision will not be disturbed unless the Court finds that no reasonable person could agree with it. (*Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984).)

## I. Propriety of Bankruptcy Court's Application of the Timbers Standard

■ Section 362(d)(2) allows a bankruptcy court to modify the automatic stay to allow an undersecured lender to foreclose on the property securing its loan if the property is not necessary to an effective reorganization. (11 U.S.C. § 362(d)(2)(A), (B).) The burden is on the debtor to show that the property is "necessary to an effective reorganization." According to the Supreme Court,

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

(*United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Inc.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (quoting *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 370–71 (5th Cir.1988)) (emphasis in original).)

Debtor challenges the bankruptcy court's decision on the ground that the court misapplied the *Timbers* standard by considering and basing its decision on matters that should be reserved to confirmation hearings. (Appellant's Br. at 15.) Debtor seems to object to two aspects of the bankruptcy court's analysis: the matters considered by the court in making its decision and the level of scrutiny to which the court subjected the

two plans proposed by Debtor in its pre-trial statement. Debtor maintains that the decision to lift the stay must be reversed because the bankruptcy court inappropriately conducted a " 'mini-confirmation hearing.' " (Appellant's Br. at 23.)

Debtor first argues that the court considered matters that are only relevant in a confirmation hearing. (*Id.* at 19.) According to Debtor, the bankruptcy court

> analyze[d] Edgewater's proposal as if it were a plan being considered for confirmation. For example, in support of its determination ... the Court referred to the following: 1) The proposed interest rate fails to approximate the market rate of interest for this type of property. 2) The faith of the lender in the management team. 3) The possibility of a cramdown. 4) The use of cash infusion. 5) Payment of administrative costs. 6) The payment of capital improvements. 7) The terms of a loan for capital improvements. 8) The projections of income and expenses. 9) The elimination of the factors that caused the bankruptcy. 10) Condominium conversion document preparation. 11) Condominium conversion budget. 12) Cost of rehabilitation work. 13) Engineers' reports. 14) Administration of the condominium association after the conversion has taken place. 15) The risk involved in the condominium conversion. 16) Commitments for funding of eventual conversion. 17) Market absorption study of the sales prices.

(Appellant's Br. at 19–20 (citing Hr'g at 20–24).) Debtor particularly objects to the bankruptcy court's focus on the adequacy of the interest rate to be paid to MONY under the Debtor's two plans, stating that "it is well-established" that the appropriate interest rate should not be determined at a relief from stay hearing. (*Id.* at 18–19, 21.)

The Court does not agree with Debtor's interpretation of the bankruptcy court's obligations under section 362(d)(2) and *Timbers*.

---

14. *De novo* review also is not appropriate with respect to the bankruptcy court's finding that there is no effective reorganization in prospect. Findings of fact are subject to *de novo* review only if they are based on either application of an incorrect legal standard or misapplication of a correct legal standard. (*Osborne v. Production*

*Credit Ass'n of River Falls,* 42 B.R. at 995.) Debtor does not argue that the bankruptcy court applied an *incorrect* standard, but argues that the court misapplied the correct one. Because the Court concludes that the bankruptcy court did not misapply the applicable standard, the finding at issue is not subject to *de novo* review.

As this Court interprets section 362(d)(2) and the *Timbers* decision, the bankruptcy court properly applied the standard applicable under section 362(d)(2).

■ The standard is defined in relation to an "effective reorganization." (See *Timbers*, 484 U.S. at 375–76, 108 S.Ct. at 633.) To be "effective," a plan must be confirmable. To be confirmable, specific requirements must be met. (See 11 U.S.C. § 1129 (1993).) As a result, in order to assess whether a debtor has met its burden under sections 362(d)(2) and 362(g), a bankruptcy court must weigh the evidence presented against the standards imposed by section 1129 to determine whether the threshold requirements of that section can be met.

In relevant part, section 1129 imposes the following requirements for plan confirmation. Each class of claims or interests must either accept the plan or not be impaired by it.[15] (11 U.S.C. § 1129(a)(8).) Plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ..." (11 U.S.C. § 1129(a)(11).) If a plan is to be confirmed notwithstanding an objection by a class of claims, i.e., if there is a "cramdown,"

the plan must be "fair and equitable." [16] (11 U.S.C. § 1129(b)(2)(A).) The plan must provide an impaired secured creditor with a market rate of interest during the repayment of its allowed claim. (*In re 8th Street Village Ltd. Partnership*, 94 B.R. 993, 997 (N.D.Ill. 1988) (citing *In re Nat'l Real Estate Ltd. Partnership II*, 87 B.R. 986, 991 (Bankr. E.D.Wis.1988)).)

Thus, there are certain threshold issues for plan confirmation that relate to plan feasibility. Impaired secured creditors must either assent to the plan or be treated fairly and equitably under the plan if it is confirmed over their objection. The plan must provide for repayment of impaired non-assenting secured creditors' allowed claims equal to the collateral value of their security at the time of confirmation plus interest at the market rate. The plan must be likely to succeed. These requirements therefore are appropriately considered by a bankruptcy court in a section 362(d)(2) context.

All of the factors that were considered by the bankruptcy court relate to the above-noted requirements. The likelihood of success is affected by the ability of Debtor to

15. A class is "impaired" under a plan unless the plan

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case ...;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(3) provides that, on the effective date of the plan, the holder of such claim or interest—receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim; or

(B) with respect to an interest, if applicable, the greater of—

(i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

(ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

11 U.S.C. § 1124 (1993).

16. A plan is fair and equitable with respect to a class of secured claims if it provides

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such secured claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holders's interest in the estate's interest in such property....

11 U.S.C. 1129(b)(2)(A).

pay administrative costs and capital improvements. The plans' potential for success also depends on the associated costs and risks. In this case, the those factors are the costs involved in any attempted condominium conversion, the likelihood of obtaining financing for those costs, the projected cash flow from either rentals or conversions, and the risk that the condominiums will not be sold.

Other factors considered by the bankruptcy court tie into the possibility of a cramdown. Whether cramdown is required depends on MONY's willingness as an impaired claimant to assent to the plan. This, as the bankruptcy court noted, depends on MONY's faith in the management team. Debtor's ability to use the cramdown provisions if MONY refuses to assent depends on the interest rate assumed in the plan and the availability of sufficient cash flow to repay the $5.6 million secured portion of MONY's loan.[17]

■ As this Court reads section 362(d)(2) and *Timbers,* the difference between a section 362(d)(2) analysis and a section 1129 analysis is in the *level of scrutiny* to which Debtor's feasibility evidence is subjected, *not* in the factors to be considered in assessing feasibility. The Court agrees with Judge Sonderby. Although an analysis under section 1129 "would be premature" at this stage of the case, section 1129 "can provide some *guidance* in analyzing the feasibility of a plan." (Hr'g at 16.) The Court holds that the bankruptcy court did not misapply the *Timbers* standard by considering the factors enumerated by Debtor.[18]

Debtor's other attack on the bankruptcy court's analysis is that the bankruptcy court subjected the two plans proposed in its pretrial statement to an inappropriate level of scrutiny, and also erroneously focused solely on those plans. (Appellant's Br. at 23.) Debtor cites various authorities—none, the Court notes, from this Circuit—for the proposition that the focus of a bankruptcy court's section 362(d)(2) analysis should be on whether the debtor can propose any confirmable plan *not* on the feasibility or confirmability of a particular plan. (*Id.* at 16–17 (citing, *e.g., In re Ocean Beach Properties,* 148 B.R. 494, 498 (E.D.Mich.1992); *In re Northport Marina Assoc.,* 136 B.R. 903, 909 (E.D.N.Y.1992); *In re 226 Washington Assoc.,* 141 B.R. 275, 281 (E.D.N.Y.1992)).)

■ As Debtor admits, the required showing—and hence, the appropriate level of scrutiny by the bankruptcy court—depends on how long after the petition is filed the secured claimant seeks relief. As one bankruptcy court articulated,

> Requiring the debtor to establish a "reasonable possibility of a successful reorganization within a reasonable time" has different meanings depending on the stage of the proceeding. Debtors should be given a full opportunity to work under the Bankruptcy Code toward a successful reorganization. However, at the same time, debtors must be realistic. Debtors must make some showing that successful reorganization is possible....
>
> However, as the case progresses, so too does the debtor's burden of proving that successful reorganization may be reasonably expected.... [T]he test should be viewed as a continuum with the scales tipping in favor of the debtor in the early stages and the burden of proof becoming greater in the later stages.

17. With respect to the bankruptcy court's scrutiny of the interest rate, the court was not only correct to assess the interest rate, but would have been remiss had it not. As Appellee MONY points out, a secured lender need not accept a proposed plan of reorganization if it does not treat the lender fairly and equitably. If the only way a plan can be made feasible is to base it on a clearly unacceptable interest rate, the plan by definition is not "fair and equitable" and cannot be confirmed over the objections of the lender. It is incumbent on the bankruptcy court to assess whether the market rate threshold can be met by

the Debtor before finding that the *Timbers* standard is met. Judge Sonderby's attention was not misplaced.

18. The Court is hard-pressed to understand how *Debtor* expects the bankruptcy court to fulfill its obligation to ground its decision in a consideration of the evidence presented without undertaking the *sort of analysis employed here.* Looking to the provisions that govern plan confirmation is not only *sensible,* it is the only reasonable method of conducting the analysis.

*(In re Ashgrove Apts. of DeKalb County, Ltd.,* 121 B.R. 752, 756 (Bankr.S.D.Ohio 1990). *See also Timbers,* 484 U.S. at 376, 108 S.Ct. at 633 ("the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan").)

The bankruptcy courts have given effect to this "sliding scale" by employing various tests. One formulation consists of a three-part test for assessing whether there is a reasonable possibility for success and a seven-part test for assessing whether the showing is within a reasonable amount of time. *(In re Ashgrove,* 121 B.R. at 756–57.) Another formulation relates the Debtor's burden to the timing of the section 362(d)(2) motion. *(In re Holly's Inc.,* 140 B.R. 643, 701–03 (Bankr.W.D.Mich.1992) (threshold showing of plausible plan in early days of case versus threshold showing of assured feasibility after expiration of exclusivity period).)

The bankruptcy court below set a relatively high threshold. The court found that Debtor had "yet to invest the resources necessary to transform this proposal into a concrete attempt at reorganization." (Hr'g at 19–20.) The bankruptcy court also faulted Debtor for its failure to take certain concrete steps toward effectuating its plans. The court noted in particular Debtor's failure to conduct a condominium absorption study, its failure to complete any of the required pre-conversion tasks, and its failure to obtain funding commitments beyond Tillinghast's conditioned commitment to provide $200,000.

 The Court cannot say that the bankruptcy court abused its discretion in applying what is concededly a fairly high level of scrutiny to Debtor's plans. Given that this is a single-asset case that was in its seventh month at the time of the hearing, it was not unreasonable for the bankruptcy court to set a high threshold. Furthermore, the level of scrutiny is not inconsistent with the level of scrutiny applied by other bankruptcy courts in similar circumstances.

The record shows that Debtor had had an extended period of time to work on its plans by the time of the bankruptcy court's hearing. Debtor's efforts to resolve the difficulties engendered by its failure to pay almost $800,000 in real estate taxes on MONY's collateral extended back over two years. The basic structure of Debtor's plans had not changed materially since it first notified MONY of its efforts to refinance in 1991. (MONY Exh. 19.) Thus, although Debtor argues that "faulting [Debtor] for not conducting a market study of absorption is simply another example of the Bankruptcy Court's premature analysis," (Appellant's Br. at 21), this Court simply cannot say that, given the length of time these plans have been "in play," no reasonable person would agree with the need for concrete evidence of feasibility.[19]

 The burden imposed on Debtor was also not unreasonable given the fact that Debtor had long since lost its exclusive right to file a plan of reorganization. (See 11 U.S.C. § 1121(c) (1993).) The hearing was held over 100 days after the end of the exclusivity period. (*See* Appellant's Br. at 29.) Bankruptcy courts need not even wait until the exclusivity period has expired to grant relief from the automatic stay. It seems reasonable to expect a debtor to present a fairly concrete proposal at the point when other parties would be allowed to submit competing plans.

Finally, although Debtor implies that seven months is a short time, Judge Sonderby's assessment that Debtor needed to offer specific, concrete evidence that the proposed plans would succeed is not inconsistent with the burden imposed on debtors in other cases by other bankruptcy courts. (See, e.g., *In re 8th Street Village Ltd. Partnership,* 88 B.R. 853 (Bankr.N.D.Ill.1988), *affirmed,* 94 B.R. 993 (N.D.Ill.1988); *In re Nat'l Real Estate,*

19. Debtor argues in its brief that "[i]f such a study were conducted today its findings would be out of date within four to six months." (Appellant's Br. at 21.) In its Motion to Strike Portions of Appellant's Brief, MONY challenges that statement as an improper reference to evidence outside the record. (Appellee's Mot. to Strike at ¶ 3(b).) MONY's objection is inappropriate. This statement is nothing more than an argument from the existing evidence. Regardless, the Debtor's statement is nothing more than an unsupported assertion and does not change the Court's view of the matter at hand.

*Ltd. Partnership II,* 87 B.R. 986 (Bankr. E.D.Wis.1988); *In re Holly's,* 140 B.R. at 700–02.) For example, Debtor would have been required to demonstrate that one of its plans would *surely succeed* under the standard imposed in *In re Holly's.* (*In re Holly's,* 140 B.R. at 702.) The bankruptcy court did not abuse its discretion.

■ The bankruptcy court's emphasis on the plans presented by Debtor is also not erroneous. It is Debtor's burden to present evidence that shows that an effective reorganization is in prospect. Debtor chose to present two plans in support of its argument against the relief from stay motion. We hardly think that it is surprising—or erroneous—for the bankruptcy court to focus on those two plans. Furthermore, Debtor never presented any evidence or even suggested that there were other alternatives.

If the plans proposed by Debtor cannot meet the confirmation requirements, they cannot form the basis for a determination that there is a reasonable possibility of a successful reorganization. In the absence of evidence demonstrating the existence of other alternatives, *and given the length of time Debtor had had to develop alternatives,* the Court cannot say that the bankruptcy court abused its discretion by focusing primarily on the only two options presented to it.

## II. *The Factual Finding That Debtor's Proposed Alternatives Do Not Constitute an Effective Reorganization in Prospect*

■ Debtor argues that the bankruptcy court's finding that Debtor's two proposals do not constitute an effective reorganization in prospect is clearly erroneous. (Appellant's Br. at 24.) Debtor argues that it "provided that Bankruptcy Court [with] sufficient documentation, exhibits and testimony to clearly and conclusively demonstrate that an effective reorganization plan is in prospect," (*id.* at 29), listing thirty-nine exhibits and

testimony from seven witnesses in support of its position.[20] (*Id.* at 24–29.)

"[F]indings of fact may not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Rule 8013 (Supp.1993). " 'A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " (*Eirhart v. Libbey–Owens–Ford Co.,* 996 F.2d 837 (7th Cir.1993) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).)

The bankruptcy court found that Debtor's rental-based alternative "is little more than conjecture," (Hr'g at 19.), and "promis[es] more than the debtor can possibly deliver." (Hr'g at 22.) The court found that Debtor's condominium conversion plan "is far from what the Timbers' court or this court would consider as a ... 'effective reorganization in prospect' ..." (Hr'g at 23.)

The Court cannot say that the bankruptcy court's finding with respect to the rental-based plan is clearly erroneous. Debtor did indeed present the bankruptcy court with a veritable blizzard of evidence. The problem, however, is not with the *volume* of evidence presented. The problem is with what that evidence does and does not show. After reviewing the evidence presented, this Court is not left with a "definite and firm conviction" that the bankruptcy court committed a "mistake" when it made this finding. (*Eirhart,* 996 F.2d at 841 (quoting *U.S. v. United States Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. at 542).)

As part of its evidence in support of the rental-based alternative, Debtor presented proforma profit and loss projections for the period of 1993 to 2003. (Edgewater Exh. 17.) Those projections contained certain assumptions regarding income and operating

---

20. Debtor also enumerates "[o]ther items that were not addressed at the hearing because they should have been unnecessary in the context of a motion to modify the stay." (*Id.* at 29.) MONY has objected to inclusion of this information on the grounds that it is outside the record on appeal. (Appellee MONY's Mot. to Strike Portions of Appellant's Brief and New Exhibits That Were Not Part of the Record at ¶ 6.) Because the Court must restrict its review to evidence in the record, the Court disregards Debtor's discussion of this additional information.

expense growth over the next ten years. (*Id.*) According to the projections, estimated "Cumulative Net Cash Flow To Fund Reorganization" at the end of ten years is approximately $3.05 million. (*Id.*)

While this Court does not agree with the bankruptcy court's criticism of the income and operating expense assumptions, evidence in the record suggests that the projections suffer from other defects. According to the record, any plan of reorganization envisioning full payment of unsecured creditors within seven years, *as does Debtor's rental-based plan,* must generate net cashflows over and above that required for operating expenses and monthly payments on MONY's secured claim sufficient to pay off $2.29 million in claims.[21] Yet, according to Debtor's own projections, the total net cash flow available after seven years (the term of Debtor's plans) is only $1.78 million.

Furthermore, as the bankruptcy court correctly noted, the expense projections do not include the cost of capital improvements. (Hr'g at 22.) As we understand Mr. Tillinghast's testimony, over $600,000 will be needed for capital expenditures in the next *two* years. (Tr. at 927–28; Edgewater Exh. 39.)

Based on this evidence, it does not appear that the bankruptcy court's finding is clearly erroneous given that Debtor's plan will not generate sufficient cash flow to achieve the results represented by Debtor. There is nothing in the record that shows how Debtor proposes to get this alternative confirmed in light of the evidence discussed above.

Our review of the record also reveals what it *does not contain.*[22] For example, although the projections are based on an assumption that MONY's secured claim will be amortized over thirty years at an interest rate of 250 basis points over the seven-year Treasury note, (Edgewater Exh. 17.), the record contains no evidence that such rate represents a market rate of interest for a thirty-year 100 percent loan.[23] The record also contains no evidence supporting Debtor's ability to secure refinancing to pay off the MONY loan at the end of seven years.

In order to meet the *Timbers* standard of an "effective reorganization plan that is in prospect," Debtor was properly required at this stage in the case to produce evidence that its proposal had a very high chance of success, both in terms of its potential financial feasibility and its confirmability. In light of the softness of Debtor's projections and the existence of evidentiary gaps such as the ones noted above, the Court cannot say that the bankruptcy court was mistaken in its finding that Debtor's rental-based alternative did not represent an "effective reorganization in prospect."

This Court also cannot say that it is left with a definite conviction that the bankruptcy court was mistaken in its view of the Debtor's condominium conversion plan. The Court is particularly reluctant to disturb bankruptcy court findings, like those here,

---

**21.** According to Debtor's petition, total unsecured nonpriority claims against Debtor's estate are approximately $232,263, exclusive of the unsecured portion of MONY's claims. Total unsecured priority claims are $106,033. Assuming the validity of the figures itemized in MONY's statement of claim, (MONY Exh. 6), and given the bankruptcy court's finding that the fair market value of the Property is $5.6 million, (Hr'g at 15), the unsecured portion of MONY's claims totals slightly more than $1.95 million.

**22.** As discussed in section 1 above, the bankruptcy court did not err in requiring Debtor to present fairly concrete support for its proposed plans. Hence, with regard to the validity of the bankruptcy court's factual finding, this Court reviewed the record with an eye toward identifying those gaps in evidence that may have played a role in the bankruptcy court's factual finding.

**23.** Debtor's argument that James Postweiler testified as to the validity of the interest rate assumption mischaracterizes Postweiler's testimony. As MONY accurately points out, (Appellee's Br. at 18), Postweiler testified that 250 basis points over Treasuries "seemed like a reasonable spread for a, quote, *market type rate.*" (Tr. at 1157 (emphasis added).) When questioned further about that statement, Postweiler noted that

> When someone talks about a market rate, there is an implication that it is a market deal which means typical underwriting parameters apply.... Today it is in the range of 70 to 75 percent loan to value with probably a 1.2 or 1.25 debt coverage ratio. It also implies that the lender is comfortable with the capabilities of the borrower and the manager, *all of which are not present in this scenario.*

(Tr. at 1162–1163.)

based heavily on testimonial evidence. The bankruptcy court simply is in a much better position to analyze the credibility of such evidence.

Debtor identified the testimony of several parties as supporting the feasibility of Debtor's condominium conversion plan. William Wolk of Thrush Edgewater Partners "[t]estified that the Phase III condominium declaration documents were being drafted and an 'add on' provision for Phase I was being considered." (Appellant's Br. at 27.) David Tillinghast "[t]estified to condominium conversion analysis that he completed on April 19, 1993." (*Id.* at 28.) John Miaso "[t]estified regarding the proposed sales prices of the Phase I units as condominiums." (*Id.*) Robert Shield of Draper and Kramer, Inc. purportedly testified that "if proper upgrades are made on the property ... he believed this to be one of the most attractive conversions he has seen in quite some time. ... Draper and Kramer is prepared to provide Edgewater with the type of financing that makes the conversion even more marketable." (*Id.* at 36.)

As is evident from the record, much of the evidence offered by Debtor consists of the opinion testimony of non-experts. Debtor relies heavily on the testimony of David Tillinghast regarding the feasibility of the condominium conversion, (see Tr. at 893–894; Appellant's Br. at 28, 29, 37), but the bankruptcy court ruled that Tillinghast was not qualified to testify as an expert. (Hr'g at 890–94.) In fact, of the witnesses identified by Debtor in its brief, only John Miaso testified as an expert.

Furthermore, despite Debtor's assertions as to the value of the testimonial evidence, the record reveals that a not insignificant portion of the testimony offered simply does not substantiate the feasibility of Debtor's condominium conversion plan. For example, a reading of the transcript of Robert Shield's testimony regarding the "feasibility" of the conversion reveals that his determination (1) was based on his personal (unexpert) opinion, (2) contained substantial caveats, and (3) had nothing to do with the potential profitability of Debtor's proposed conversion.[24] Miaso's opinion regarding the feasibility of conversion did not take into account the expenses associated with conversion or the time required to sell out the units. (Tr. at 1004–1005.)

The bankruptcy court did not accord the proferred testimony much weight. The court felt that "the debtor ha[d] not addressed" the "substantial risk associated with any condominium conversion." (Hr'g at 23.)

Mindful of the import of Bankruptcy Rule 8013, we cannot say that the bankruptcy court was mistaken in its decision. "Opinion evidence is not binding on the fact finder even if no contradictory evidence is offered by the other side. The fact-finder ... should only give it weight in inverse ratio to the amount of speculation and unfounded assumption it perceives to form a part of it." (*Dodge v. Stine,* 739 F.2d 1279, 1284 (7th

---

24. Q. What is your experience with Draper & Kramer ...?

A. I joined Draper & Kramer in 1980 and since that time I have been involved with originating loans for residential buyers and project approvals due to the FHA, VA, Fannie Mae, Freddie Mac, and various other agencies.

(Tr. at 1094.)

Q. Is [the Property] a suitable product for condominium conversion?

A. I believe almost anything can be converted *at a price.* So *if the proper price is selected* for these units, *if the proper upgrades are put in place* to make these condos rather than apartments in a buyer's mind, I believe it is probably one of the most attractive conversions I have seen in a long time with respect to the setting because it has a very unique setting and one that I don't think is duplicated anywhere in the Chicagoland area.

(Tr. 1103–04 (emphasis added).)

Q. So when you were using the word feasible, I take it you weren't expressing any opinion that was evaluating what the costs would be or what the prospective income would be to decide whether someone could make money converting these units?

A. I am not making that statement at all. You are right.

(Tr. at 1123.)

Q. Also I noted that when you were defining your definition of successful theories on condo conversion that you didn't say anything about how long it would take to sell out because your focus in on lining up mortgages, right?

A. That is correct....

(Tr. at 1124–25.)

Cir.1984) (citing *United States v. Northern Paiute Nation,* 393 F.2d 786, 802, 183 Ct. Cl. 321 (1968)).) Furthermore, as Judge Hart noted in a similar case, "It [is] for the bankruptcy court to determine whether the testimony [of a non-expert as to the financial future of a piece of real estate] [is] credible and based on sound reasoning." *In re 8th Street Village Ltd. Partnership,* 94 B.R. 993, 997 (N.D.Ill.1988).[25]

The weakness of the testimonial evidence is not offset by other evidence. The record reveals evidentiary gaps similar to those noted above with respect to the rental-based plan. There is no evidence that Debtor had taken or was taking the steps necessary to advance the condominium conversion plan— steps identified by its own witness Robert Shield. The Court also notes the absence of evidence that would allay the bankruptcy court's fears about the risks of a condominium conversion. Tillinghast's testimony, for example, relies on condominium sales timing assumptions that appear to be inconsistent with Illinois law and the regulations of purchaser financing sources such as the FHA.

On the record as a whole, the Court is not left with the conviction that the bankruptcy court was mistaken in its factual finding that the condominium conversion plan did not constitute "an effective reorganization that is in prospect." The bankruptcy court's finding is not clearly erroneous.

### III. *The Bankruptcy Court's Finding That Debtor Could Not Propose a Feasible Plan of Reorganization*

Debtor separately challenges the bankruptcy court's ultimate determination that Debtor "cannot propose a feasible reorganization." (Hr'g at 18.) Debtor's argument is basically nothing other than a re-hashing of the same arguments and re-presentation of the same evidence advanced in support of its contentions that the bankruptcy court erred

in its application of the *Timbers* standard and erred in its factual finding regarding the feasibility of Debtor's proposed plans. In light of the Court's extensive discussion of those issues, further commentary is unnecessary. For all the reasons stated above, the Court hold that the bankruptcy court's finding that Debtor cannot propose a feasible reorganization is not clearly erroneous.[26]

### IV. *The Bankruptcy Court's Finding That Debtor's Future Income and Expense Projections Are Unrealistic*

The bankruptcy court found that Debtor's ten-year proforma income and expense projections were unsupported by the evidence. (Hr'g at 21.) The court found that the gross income projections were unsupported in that they assumed an average annual growth rate of 18.6 percent for 1993 through 1997 when the historic annual growth rate was only 3.5 percent according to Debtor's income tax returns. (*Id.* at 21.) The court also found that Debtor's expense projections were "unusually low," in that they assumed a 3.8 percent increase in expenses for 1994 when the tax records showed "double-digit" expense growth. (*Id.* at 22.)

Debtor maintains that the bankruptcy court erred in its findings. Debtor argues first that the bankruptcy court should not have relied on Debtor's tax returns in its analysis because "partnership tax returns contain many additional items other than current income and expenses, such as ... depreciation ..." (Appellant's Br. at 42–44.) Debtor maintains that the income and expense growth assumptions contained in its projections are conservative, consistent with the Property's historical results, and supported by the evidence. (*Id.* at 44–45.)

At the outset, the Court notes that Debtor's objections to the bankruptcy court's use of the income tax returns are unpersuasive. The bankruptcy court relied on those docu-

---

25. The Court notes, however, that it would find no error in the bankruptcy court's determination even under a less deferential review. The testimony proferred, in the Court's view, simply does not prove what the Debtor wishes it would prove.

26. Debtor goes to great length challenging the bankruptcy court's "reliance" on a certain letter

in concluding that converting the Property into condominiums would flood the market. (Appellant's Br. at 38–39.) Because the Court concludes that the bankruptcy court's findings would be justified even if that evidence were excluded, we do not address the issue of the admissibility of that evidence.

ments because Debtor was unable to produce its historical operating records. The record shows that Terry Davis admitted during the hearing that, in the absence of the destroyed records, the tax returns contained the best available information about historical expenses. (Tr. at 524–25.) Debtor cannot be heard to complain about a situation that is (at least partially) of its own making.

Although the Court does not disagree with the bankruptcy court's use of the income tax returns, we do conclude that the bankruptcy court's findings are clearly erroneous. It appears that the bankruptcy court mistakenly used income and expense figures for May through December of 1993 as the basis for its calculation of the assumed annual growth rate when those figures did not represent annualized figures. (Hr'g at 21–22.) In other words, the bankruptcy court calculated an incorrect average annual percentage increase because it used partial-year figures as its base figures.[27] The bankruptcy court's error with regard to this component of its feasibility analysis does not render erroneous its finding that Debtor's proposed plans do not meet the *Timbers* standard, however, for the reasons discussed above.

## V. The Bankruptcy Court's Finding That Debtor's Proposed Cash Infusion Is Insufficient to Facilitate a Condominium Conversion Absent Additional Commitments to Loan Funds

In analyzing whether Debtor's condominium conversion plan constituted an effective reorganization in prospect, the bankruptcy court noted that "the debtor has obtained no commitments for funding an eventual conversion," and found that the proposed $200,000

loan from David Tillinghast was "insufficient absent additional commitments to loan funds." (Hr'g at 23.) Debtor challenges this finding, arguing that its exhibits and testimonial evidence demonstrate that Debtor will have sufficient funds to complete the conversion and pay off MONY "and all other creditors." (Appellant's Br. at 47–48.)

After reviewing the record, the Court is not sufficiently convinced that the bankruptcy court made a mistake to conclude that the finding is clearly erroneous.[28] According to David Tillinghast's testimony, conversion costs are estimated to be approximately $2.3 million. (Tr. at 907.) Tillinghast testified that "the expenditures [sic] of the $2,300,000 will take place over a period that went in just [sic] three months before the last units closed." (*Id.*) Debtor apparently plans to pay the costs out of condominium sales proceeds. (Appellant's Br. at 37.)

Although the Court cannot determine from the record exactly how the bankruptcy court arrived at its decision, it certainly appears to the Court that Debtor's financing scheme is seriously flawed. With an additional cash infusion of only $200,000, the only way the conversion can be accomplished is if Debtor takes the proceeds realized from the sale of units and uses them to rehab the next units sold. If the units do not sell at the pace assumed, the conversion will stall.

Debtor's representation that Robert Shield "testified that his company is prepared to provide financing in support of the condominium conversion plan," (Appellant's Br. at 47), inaccurately portrays the import of that testimony. As is apparent when one reads the transcript of that testimony, Shield and Draper and Kramer might be interested in

27. The error is apparent when one attempts to verify the bankruptcy court's calculation of the income growth rate for the period of 1993 through 1997. The only way to approximate the 18.6% growth rate calculated by the court is to assume that the $959,867 shown as total collected income for May–December 1993 represents total collected income for a full-year period. In fact, it represents projected income for an eight-month time period.

28. MONY again challenges some of the information contained in Debtor–Appellant's brief on the grounds that it is not part of the record on appeal. In particular, MONY asks us to ignore

information contained on page 46 of Debtor–Appellant's brief regarding net rental income estimates for April 1993 through August 1993, and total estimated conversion costs for the first two months following conversion. (Appellee MONY's Mot. to Strike Portions of Appellant's Br. and New Exh. That Were Not Part of the Record at ¶ 3(g).) Appellant admits that this information was not before the bankruptcy court. Because the scope of this review is limited to the record on appeal, the Court will not incorporate the challenged information into its assessment of the bankruptcy court's finding.

providing financing for the *purchasers* of the units. There is nothing in the record to suggest their interest in providing financing for the conversion itself.

Furthermore, what Debtor is proposing to do is sell off MONY's collateral piece by piece without using the proceeds to pay down MONY's secured loan.[29] There is absolutely no evidence in the record that suggests that MONY would approve of such a plan. The bankruptcy court's finding is not clearly erroneous.

### VI. *Other Bankruptcy Court Findings Adverse to Debtor*

In its final attack on the bankruptcy court's findings, Debtor challenges a statement by the bankruptcy court that "MONY has no confidence in TAD given its past conduct, like TAD's representation that real estate taxes were being paid when in effect they were not being paid." (Hr'g at 20.) Debtor argues that this statement in inaccurate because "TAD did not represent ... that the real estate taxes had been paid." (Appellant's Br. at 48.)

The bankruptcy court's finding is not clearly erroneous. The letter referred to by Debtor in support of its argument is, at best, unhelpful to Debtor's position. It explicitly refers to a $500,000 certificate of deposit that Debtor represented would be available to pay real estate taxes. Furthermore, the Court cannot say that the bankruptcy court was mistaken in light of the testimony provided by Terry Davis with regard to the payment of real estate taxes.[30] Davis' testimony certainly could have been interpreted by the bankruptcy court as evasive and disingenuous. There is no clear error here.

### Conclusion

In summary, the Court holds that the bankruptcy court correctly applied the *Tim-*

*bers* standard in determining whether Debtor met its burden of demonstrating that there was an effective reorganization in prospect. Furthermore, the Court holds that the bankruptcy court's findings, with the exception of the finding relating to the validity of the income and operating expense projections, are not clearly erroneous. Thus, for the reasons stated above, the decision of the bankruptcy court to grant MONY's motion for relief from stay is affirmed. MONY may proceed with the foreclosure proceedings now pending in state court.

---

29. In essence, then, Debtor's condominium conversion plan simply forces MONY to assume additional risk and finance the conversion.

30. In response to questions about the inclusion of real estate taxes in several of the income and expense summaries provided to MONY, Davis admitted that the real estate taxes had not been paid at the time those figures were included in the summaries. (Tr. at 526–528.) Davis commented that "I don't think it is the intention of this document to say that they were paid because there is depreciation on these statements and that is not paid.... I don't think it represents that every one of these items were paid." (*Id.* at 528.)