**In re NATTCHASE ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**CMF LOUDOUN LIMITED PARTNERSHIP, Movant,**

v.

**NATTCHASE ASSOCIATES LIMITED PARTNERSHIP, Respondent.**

**Bankruptcy No. 94–10356–AA.**
**Contested Matter No. 94–906.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Dec. 27, 1994.

Thomas J. Catliota, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for movant.

Richard J. Stahl, Dixon, Smith & Stahl, Fairfax, VA, for debtor.

## MEMORANDUM OPINION AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

This Contested Matter comes before the Court on the Motion for Relief from the Automatic Stay filed by CMF Loudoun Limited Partnership ("CMF"), the holder of a security interest in property owned by the debtor, Nattchase Associates Limited Partnership ("Nattchase"), which collateral consists of real property located in Loudoun County, Virginia. The obligation of Nattchase owned by CMF is evidenced by that certain Deferred Purchase Money Deed of Trust Note ("Note"), dated June 28, 1988, representing an indebtedness as of the filing of the Chapter 11 petition of at least $51,-458,414.71. The Note was purchased along with other unrelated notes by CMF from the Resolution Trust Corporation ("RTC") on May 6, 1993.

The Court has jurisdiction over the parties and the matter in controversy by virtue of 28 U.S.C. §§ 1334(b) and (d), 28 U.S.C. §§ 157(a) and (b)(1), 11 U.S.C. § 362 and this

is a core proceeding under 28 U.S.C. § 157(b)(1)(G). This opinion and order constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The parties stipulated the controlling facts concerning the execution of the Note, the collateral securing the obligation due thereunder, the total amount of the indebtedness, the fact that the debtor, Nattchase, disputes the debt due and the market value of the debtor's property as $13,600,000.

## Background

Before addressing the findings of fact and substantive issues before the Court on the relief from stay motion, it is instructive to discuss the history of the Note and the procedural history of the ongoing litigation between the parties.

Nattchase is a limited partnership formed under the laws of the Commonwealth of Virginia and filed an involuntary petition under Chapter 11 of the Bankruptcy Code on January 31, 1994. Sidney Brown ("Brown") and Saul Bernstein ("Bernstein") are experienced real estate developers and the general partners of Nattchase. On June 28, 1988, Nattchase purchased four parcels totalling approximately 311 acres of undeveloped real property for $45,000,000 in Loudoun County, Virginia.[1] Nattchase made a $9,000,000 down payment at settlement, and obtained a loan from San Jacinto Savings Association[2] for the balance, represented by the nonrecourse promissory Note which is secured by the debtor's property. The Note requires the payment of principal and interest in quarterly installments of $1,111,563 commencing on October 1, 1988, and continuing

until the maturity date of June 28, 1998, at which time all outstanding amounts are due and payable. Five payments were made under the Note by Nattchase, and the last payment was made on or about December 1989.

In December of 1990, the RTC was appointed receiver for San Jacinto, becoming the successor in interest in the Note and mortgage held as security for the payment of the remaining balance. Nattchase offered to purchase the Note and mortgage from the RTC, but the RTC rejected its offer. The RTC opted to offer a portfolio of assets, including the Note and two other notes with respect to which the debtor had absolutely no relationship, for sale by bid on March 9, 1993. By March, 1993, Nattchase was at least $14 million in arrears, and pursuant to the terms and conditions of the bidding established by the RTC, no principal of the borrower on the Note could bid on the assets offered for sale by the RTC.[3] On May 5, 1993, the RTC announced the winning bid, and on July 28, 1993, CMF purchased the portfolio of financial assets, including the Note, from the RTC for $14,250,108.00. The three secured notes in the portfolio had a total principal balance of $70,766,564 plus accrued interest in excess of $15,000,000 (debtor's Proposed Findings of Fact).

## Procedural History

Nattchase did not make any payments to CMF on the Note; therefore, CMF scheduled a foreclosure sale of the debtor's property on November 22, 1993. On November 18, 1993, several individuals and business entities[4] in which Brown was involved, (hereinaf-

---

1. The real property securing the note consists of four parcels: Steeplechase § I, Steeplechase § II, Steeplechase § III, and the Nattak site.

2. San Jacinto is the successor in interest to Sajacito Inc., the former titleholder of the properties. Southmark Corp. is a subsidiary of San Jacinto. San Jacinto, Sajacito, and Southmark were all named party defendants in the later suits filed by Brown, et al.

3. Under 12 U.S.C. § 1441a(f)(1)(D) (Supp.1994), the RTC shall prescribe regulations to prohibit the sale of assets of a failed institution by the RTC to any person who has demonstrated a

pattern or practice of defalcation regarding obligations to a failed institution. Here, that institution is San Jacinto Savings Association. Pursuant to this section, the RTC established regulations prohibiting entities from bidding if that entity has generated two losses above $50,000. Clearly, the fact that Nattchase was over $14,-000,000 in arrears was dispositive on this issue.

4. Sidney J. Brown, Saul H. Bernstein, Nattchase Associates Limited Partnership (Nattchase), Brown and Bernstein as general partners of Nattchase on behalf of its limited partners, and Mid City Redevelopment Corp.

ter "Brown, et al.") filed suit against the RTC and CMF among others.[5] Identical suits were simultaneously filed, one in the United States District Court for the District of Columbia, and the other in the United States District Court for the Eastern District of Virginia.[6] The suits contained a myriad of counts, however the most pertinent allegations challenged the constitutionality of bidding procedures of the RTC, based on equal protection and due process considerations, and requested a temporary restraining order and preliminary injunction to prevent CMF from foreclosing. Both suits were heard on November 19, 1993.[7] The first suit to be heard was before Judge Green of the District Court of the District of Columbia. In *Brown, et al. v. Resolution Trust Corp., et al.*, No. 93–2386 (D.D.C.1993), Judge Green denied the temporary restraining order finding no substantial likelihood of success on the merits, no irreparable harm, and ultimately dismissed the case in that jurisdiction without prejudice.[8] Later that day, Judge Brinkema of the Eastern District of Virginia, after being advised of the disposition of the case in the District of Columbia, heard *Brown, et al. v. Resolution Trust Corp., et al.*, 93–1450–A (E.D.Va.1993). Judge Brinkema found no cause on any of the four prongs [as articulated by the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189 (4th Cir.1977)] to issue a temporary restraining order. In light of the fact that Nattchase was at least $14 million in arrears,

Judge Brinkema found that the "plaintiff did not come into court with clean hands in that he is significantly in arrears on debt that is involved in this case." Transcript at 29, *Brown, et al. v. Resolution Trust Corp., et al.* (E.D.Va.1993) (No. 93–1450) The Court found as a matter of law that there is no basis upon which the plaintiff could prevail against *any* of the defendants and therefore dismissed the case with prejudice. *Id.* Unable to find relief in the district courts, Nattchase filed for relief under Chapter 11 of the Bankruptcy Code on November 19, 1993.[9]

Brown et al., also filed a motion to vacate or modify the order of Judge Brinkema, which was heard on December 21, 1993, and subsequently denied.

Brown appealed the decision of Judge Brinkema to the Court of Appeals for the Fourth Circuit. On July 25, 1994, the Fourth Circuit, in an unpublished *per curiam* decision, affirmed the district court as to the dismissal with prejudice of Brown's claim against CMF and as to its denial of injunctive relief. Relative to the dismissal of Brown's claim against the RTC, the appellate court modified the district court's decision to a dismissal without prejudice such that the appellants could pursue administrative relief before the RTC. The Fourth Circuit did not find any merit to the allegations of irregularity made by the plaintiffs, and held that all such administrative processes must be exhausted before any action is properly presented to the Federal Court. *Brown, et al.*

---

5. Suit was filed against the RTC, San Jacinto Savings Association or its successor, Sajacito Inc., or its successor, Southmark Corp. or its successor, CMF Loudoun, L.P., and its principal individual, Carl M. Freeman, as well as Robert E. Sevila, Trustee.

6. The suit in the Eastern District of Virginia was filed by Brown, pro se. The complaint filed was identical to that filed in the District of Columbia, however there was a handwritten addendum describing the portfolio of assets offered for sale by the RTC.

7. The transcripts from the prior proceedings differ as to the exact reason why suit was filed in both the District of Columbia and Virginia Apparently, the complaint was filed on behalf of Brown, et al., because counsel thought that jurisdiction lay in the District of Columbia, in light of the fact that both Mr. Brown and the RTC were residents of the District of Columbia. The com-

plaint was subsequently filed in Virginia because counsel for the debtor became aware that the District of Columbia's judge might be concerned over her *in rem* jurisdiction.

8. In light of the location of the property, the status of CMF and Nattchase as Virginia limited partnerships, and the case pending in the Eastern District of Virginia, the District of Columbia court ruled that the case was to be dismissed in that jurisdiction, but without prejudice to the plaintiffs developing their case in some other forum.

9. That bankruptcy petition was administratively dismissed on December 10, 1993 due to a deficiency in filing; the debtor filed the voluntary petition on a pro se basis, in violation of Local Rule 203.

*v. Resolution Trust Corp.*, No. 94–1104, slip op., 1994 WL 384727 (4th Cir. July 26, 1994). On August 5, 1994, Brown et al., filed with the Fourth Circuit a petition for rehearing and a request for rehearing en banc. Both the petition and request were denied without opinion on August 19, 1994.

Concurrent with the litigation over the constitutionality of the bidding process and the RTC's actions thereunder, CMF pursued its state law rights regarding the property. After the district court denied Brown's motion to reconsider or vacate, CMF noticed a second foreclosure sale which was to be held on February 2, 1994. On January 31, 1994, Brown filed the current involuntary petition and an order of relief was entered on March 8, 1994. It is this petition out of which the relief from stay motion arises.

### Findings of Fact

#### A. Current Status of the Note

The Note was initially for $36,000,000. Nattchase has made a total of five payments on the Note obligation since its execution, and the last regular payment was made in 1989. Nattchase tendered a "small" payment of approximately $566,500 to the RTC in March 1993 when a portion of the Steeplechase § I parcel was sold.[10] The parties stipulated that the debtor has paid a total of $5,989,496 on the note, while the total amount of indebtedness due on the Note, inclusive of principal and interest, exceeds $50,000,000. The parties also stipulated that the debtor has previously paid $1,641,215.29

10. According to the testimony, the March payment was made after Orbital Sciences Corp., an adjacent entity seeking to expand, purchased a small portion of the property from Nattchase on the Steeplechase § I site.

11. Nattchase proposed at the hearing before this Court to pay the real estate taxes becoming due on December 5, 1994.

12. Nattchase disputes the assertion by CMF that it is the holder in due course of the Note and due any amounts thereunder. Nattchase argues that CMF is not a holder in due course because of "the irregularities in the bidding process and because it has a claim before the RTC." *See* Plaintiff's Proposed Findings of Fact. Currently, Nattchase is pursuing its administrative remedies

in real estate taxes to Loudoun County. However, such taxes have not been paid to Loudoun County since 1990, giving rise to a priority tax claim in excess of $2,100,000.[11] At this time, the debtor continues to dispute that any amounts are due under the Note.[12]

#### B. Current Status of the Properties

The property in question consists of four parcels of undeveloped land, known as Steeplechase §§ I–III, and the Nattak site which are all located in Loudoun County, equidistant from Route 7 and Dulles Airport in an area known as the "Route 28 Corridor". The Steeplechase sites are contiguous parcels zoned for use an industrial park.[13] Steeplechase § I consists of five recorded lots, totalling approximately 29.5 acres. Steeplechase § II is approximately 79 acres, of which approximately 68 acres are useable land. Steeplechase § II is a single parcel which has been preliminarily approved for subdivision into nineteen lots; recordation of the subdivision plat has not occurred, but final approval is supposedly imminent. The land for Steeplechase § I and § II has been improved with utilities on each site, as well as a spine road, curb and gutter. Steeplechase § III is raw land, consisting of approximately 120 acres. Currently Steeplechase § III is zoned for industrial park use, but an application has been submitted to change such zoning to residential. The application is inactive at this time. The final site, Nattak, is approximately 72 acres of undeveloped, raw land, zoned for a 600,000 square foot shop-

with the RTC and challenging the sale of the Note to CMF. At the hearing on the motion for relief from stay, the Debtor renewed its position, and argued that until the matter is fully decided, CMF should not be deemed the holder of the Note entitled to pursue relief from the stay. This Court has maintained throughout these proceedings, and continues to maintain, that it is bound by the decision of the Court of Appeals for the Fourth Circuit, and notes in passing that the appellant has applied for a writ of certiorari to the Supreme Court of the United States as of November 15, 1994.

13. The technical name for this type of zoning is "PDIP", or Planned Development Industrial Park. Lennhoff Report at 12.

ping center.[14] The properties owned by the debtor produce no income and must be extensively improved at substantial expense before any potential usage or marketing of the property could be realized by the partnership.

Although the location and description of the property in question are integral to our analysis, the Court cannot view them in a vacuum. Across the street from and north of the Nattak site lies another site already in the development process. This area, known as the Dulles 28 property, is zoned and being promoted as a shopping center which can accommodate approximately 800,000 square feet of retail stores. The lots on this property are currently available for tenants to occupy. A Wal–Mart is already in operation, and testimony indicated that another widely known electronics chain has committed itself to the space, as well as an auto parts store. Steeplechase § III lies next to the Dulles Town Center, or the Lerner property, has approximately 1.2 million square feet, and is being promoted as a superregional type of mall with an additional office component.

While the parties stipulated that there is presently no equity in the parcels owned by Nattchase, each called an analyst at the hearing on CMF's motion for relief from stay to present an evaluation as to the marketability of the property. Mr. William S. Wise, the analyst who testified on behalf of Nattchase, concluded, *inter alia*, that the highest and best use[15] of the debtor's properties would be to hold the property before commencing development. Mr. Wise, who is qualified to opine about the future marketability of Loudoun County real estate[16], did not appraise the parcels to determine the current market value. Wise based his conclusions from his marketability analysis on information contained in various publications which analyzed and compared the real estate development corridors in Loudoun County and the surrounding areas.

CMF called Mr. David Lennhoff[17] as a market analyst for the properties owned by Nattchase. Mr. Lennhoff concurred with Mr. Wise's determination that the highest and best use for the Nattchase parcels would be to hold them speculatively by thoroughly analyzing the real estate market trends in the Loudoun County and related areas. Lennhoff's conclusions were based on a review of comparable sales and projects, as well as potential developments in the immediate area surrounding the debtor's parcels. Particular attention was directed toward the applicable zoning and the usage of potential acreage for development in Loudoun County. The Court finds Mr. Lennhoff's analysis thorough and his conclusion was factually based and sound.

Therefore, the experts called by both parties basically agreed on the highest and best use of the property, and disagreed only as to the time frame for the potential development of the properties. The consensus conclusion is that the properties will be very valuable within three to seven years after careful planning and extensive development. The Court is not required to accept either estimate of the proper time for development. An average time frame would be five years, but it is sufficient for this Court to conclude that significant development and subsequent appreciation of the parcels will not be feasible or wise for a significant period of time from the filing of the petition herein.

The instant Chapter 11 petition was filed as an involuntary petition in order to save the partnership's assets. In rebuttal to the motion filed by CMF, the debtor tendered to the Court at the hearing a proposed copy of

14. More precisely, "Planned Development Shopping Center". Lennhoff Report at 12.

15. "Highest and best use" is a term of art which is defined as, "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Lennhoff Report at 47 (citing APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE, at 275 (10th ed. 1992)).

16. The parties stipulated as to Mr. Wise's qualifications to testify before this Court as an expert.

17. Mr. Lennhoff has been a real estate appraiser for approximately twenty-two years, and has been actively involved in various organizations in the real estate appraising community. He also is an experienced teacher of graduate level courses on marketability analysis.

a Chapter 11 plan [18] in order to meet its burden under 11 U.S.C. § 362(g). The Court notes that to date, the debtor has not filed a signed, proposed plan of reorganization in these proceedings. The Court further notes that the Treasurer of Loudoun County filed a Statement in Support of the CMF Motion for Relief from Stay, but the County neither appeared at nor participated in the hearing.

### Conclusions of Law

CMF has moved for relief from the automatic stay under § 362(d) of the Bankruptcy Code. Sections 362(d)(1) and (d)(2) are phrased in the disjunctive, and therefore proof under only one of these sections is sufficient to warrant relief. The Court address CMF's motion under both subsections of 362(d) and in light of the evidence before us, ultimately concludes that CMF's motion should be granted under both (d)(1) and (d)(2).

The Court first addresses whether relief from the automatic stay is warranted under 11 U.S.C. § 362(d)(1) which provides relief from the stay, "for cause, including the lack of adequate protection of an interest in property of such party in interest." "Cause" has been defined variously by the courts analyzing the concept. One example of "cause" would be to demonstrate that the debtor is not providing adequate protection to the creditor's interest in the property. In *Equitable Life Assurance Society of the United States v. James River Assoc. (In re James River Assoc.),* 148 B.R. 790 (E.D.Va. 1992), the district court upheld the bankruptcy court's decision to grant a relief from stay under § 362(d)(1). There, the courts found that the debtor's failure to make monthly payments under the loan for over one year, coupled with a small or nonexistent equity cushion was a basis for finding lack of adequate protection, constituted cause. *Id.* at 797. *See, e.g., Kessler v. Merrill Lynch Mortgage Corp. (In re Kessler),* 76 B.R. 434

(Bankr.E.D.Pa.1987); *In re Kerns,* 111 B.R. 777, 790 (S.D.Ind.1990). Furthermore, a showing that the debtor has failed to pay estate taxes may also be sufficient to grant relief for cause. *In re James River Assoc.,* 148 B.R. at 796. In this case, the parties have stipulated that there is no equity in the property. Nattchase has not made a regular payment to CMF in over five years, and has not paid real estate taxes since 1990. The Court finds this egregious behavior, and it is clear to us that CMF is not adequately protected, and that cause exists to grant relief under the Code.

CMF has also moved for relief under 11 U.S.C. § 362(d)(2), which provides in pertinent part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
>
> .    .    .    .    .
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

The movant, CMF has the burden of proving that the debtor has no equity in the property. 11 U.S.C. § 362(g)(1). The burden of proof then shifts to the debtor on all other issues, i.e., that the property is "necessary to an effective reorganization" under subsection (B) of § 362(g)(2). In the case *sub judice* the parties stipulated that there is no equity in the property of Nattchase, and thus, the debtor has the burden of proof to show that

---

**18.** The proffered Chapter 11 Plan, which has not been signed or filed by the debtor, provides that the four parcels of Nattchase will be sold within one year of the effective date, at which time CMF will be paid no less than $11,500,000, plus accrued interest from the effective date at 4% per annum, with no interim payments to be made to CMF. There is also a provision to pay the unsecured portion of CMF's claim on a pro-rata basis sharing in $500,000 payable over 10 years or $250,000 payable over 5 years, either period commencing three years after release of the CMF Deed of Trust.

the property is necessary to an effective reorganization.[19]

The test to be applied by the Court in determining whether the property of the debtor under consideration is necessary to its successful reorganization is set forth in the Supreme Court's decision in *United Savings Ass'n, of Texas v. Timbers of Inwood Forest Assoc., Inc.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Supreme Court determined that it is not enough for the debtor to show that there will conceivably be an effective reorganization on the horizon, but that the property is essential for an effective reorganization *that is in prospect. Id.* at 375–76, 108 S.Ct. at 632 (emphasis in original). That is, that the debtor must show it has a realistic potential to reorganize its affairs in the reasonably foreseeable and determinable future. The Court will utilize a two part test, first determining if there has been a showing of a reasonable possibility of a successful reorganization and then whether that showing has come within a reasonable time. *Id.*

### A Reasonable Possibility of Reorganization?

#### A. The Plan

The Court does not conclude that the debtor is prejudiced by failing to file a plan of reorganization. Most courts have found that a debtor's failure to file a plan prior to the bankruptcy court's hearing on the motion to lift the stay is not fatal to its position opposing such motion. *See Edgewater Walk Apts. v. MONY Life Ins. Co.,* 162 B.R. 490, 494 n. 5 (N.D.Ill.1993) (the appropriate query is that articulated under *Timbers).* Furthermore, the debtor is not required to demonstrate that it actually proposed a plan acceptable to its creditors, but need only show that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization. *General Motor Inns, Inc. v. L & M Properties, Inc. (In re L & M Properties, Inc.),* 102 B.R. 481, 484 (Bankr.E.D.Va.1989). At a minimum, the debtor must provide the Court with a broad outline of how it intends to employ the rehabilitative mechanisms of

the Code to effectuate a reorganization within a reasonable period of time. *Id.* Nattchase filed for involuntary bankruptcy in January, 1994, and the exclusivity period ended in May, 1994. As of the date of this hearing, Nattchase has not filed a plan of reorganization, which is not dispositive of the issues before the Court.

CMF argues that any plan proposed by the debtor will be unconfirmable because of its rights as the first lienholder on the Nattchase property. The court believes that the legal issues CMF raises to show that Nattchase's proposed plan is patently unconfirmable are more appropriately decided in the context of a confirmation hearing. However, this Court recognizes that in order to be "effective," a plan must be confirmable. *See In re Cho,* 164 B.R. 730 (E.D.Va.1994). At this time, it is not appropriate for the Court to conduct an in depth analysis as to whether the debtor's potential plan can survive § 1129 scrutiny. *See Edgewater Walk Apts.,* 162 B.R. at 499 ("[T]he difference between a section 362(d)(2) analysis and a section 1129 analysis is in the level of scrutiny to which Debtor's feasibility evidence is subjected, *not* in the factors to be considered in assessing feasibility.") (emphasis in original). However, § 1129 can provide guidance in analyzing the feasibility of the plan, for if the proposed plan cannot meet confirmation standards, it cannot form the basis for finding a reasonable possibility of a successful reorganization as required by the Code. *In re Cho,* 164 B.R. at 733.

The debtor has not proposed in the tendered plan to adequately deal with the debt due CMF other than through a sale of the property within one year from the effective date of the proffered plan, once it is filed and confirmed. The debtor's analyst did not opine concerning the sale of the debtor's real estate, and the tendered plan merely assumes a sale within one year without any support for the assumption. The appraisal of Lennhoff was the only evidence presented which addressed the feasibility of selling the Nattchase parcels, and he concluded that a

---

19. The lack of equity alone can be sufficient reason to grant relief from the automatic stay.

*See In re Burns,* 112 B.R. 763 (Bankr.E.D.Va. 1990).

sale of the subject parcels cannot be realized for a minimum of eighteen months. Briefly reviewing the debtor's proposed treatment of various classes of its creditors, the Court finds that the suggested plan of reorganization will not meet the requirements of § 1129 for confirmation. For example, the plan does not meet the requirements of the Bankruptcy Code in satisfying the priority claim of Loudoun County for real estate taxes or the secured claim of CMF, and allows for the retention of ownership of the debtor's property by the principals of the debtor without paying all superior classes in full, and is therefore not confirmable in its present state. From this proposition by Nattchase, the Court cannot conclude that there is a reasonable possibility of a successful reorganization within a reasonable time. *See In re L & M Properties, Inc.*, 102 B.R. at 481.

### B. Financial Prospects

■ In determining whether there is a reasonable possibility of a successful reorganization, the Court must look to the financial prospects of the property in question. Clearly the relief from stay hearing is not the time for the Court to determine the ultimate accuracy of financial projections, but the Court is obliged to analyze the evidence before it. Courts have found that unless the projections are shown to be highly inaccurate, or are fixed in a manner that makes operation of the property unfeasible, the projections need only show that reorganization is possible, or likely. *See In re Northgate Terrace Apts., Ltd.*, 126 B.R. 520, 524 (Bankr. S.D.Ohio 1991). However, a reasonable possibility for reorganization cannot be grounded solely on speculation, and a "mere financial pipe dream" is insufficient to meet the requirements of § 362(d)(2). *In re L & M Properties, Inc.*, 102 B.R. at 484 (citing *In re Dublin Properties*, 12 B.R. 77, 81 (Bankr. E.D.Pa.1981)). Further, "[t]o determine that there can be an effective reorganization of the debtor's business, the debtor must per-

suade the Court that the operation of the business will generate sufficient income to pay debt service." *In re L & M Properties*, 102 B.R. at 485. The plight of the single asset debtor is unique, for an integral component of the ability to reorganize turns on the ability to utilize the property for income producing purposes.

■ The testimony of the analysts focused on the issue of when this property will be ripe for development purposes, given the anticipated financial conditions of the real estate market in that area. CMF's analyst stated that the market conditions in Loudoun County have been greatly over supplied in all areas over the past three years. After reviewing statistical data on the market conditions, vacancy and absorption rates, pertinent trade publications, and speaking with individuals similarly situated in the area, Lennhoff concluded that the highest and best use for the subject parcels is to hold the properties speculatively until such time as demand is sufficient to justify development. In the case of Steeplechase §§ I–III, the parcels should be held for five years, and the Nattak site should be held for seven years before commencing development. Lennhoff Report at 49. The debtor's analyst indicated that economic conditions in this portion of Loudoun county were slowly improving as evidenced by a low unemployment rate, declining vacancy rates in nonresidential buildings over the past year, and a rise in retail sales. Wise concluded that the highest and best use for the properties owned by the debtor would be to hold them for development from three to five years. Thus, according to both experts, it would not be prudent to develop the parcels for at least three years, and possibly up to seven years.

The analysts testified to the existing supply or competition for land zoned for development of shopping centers in the Loudoun County area. Nattchase officials indicated that the debtor plans to market the Nattak property as a "power center".[20] Apparently,

---

**20.** There are four general categories of shopping centers which are all variations on a single theme. Those categories are superregional, regional, community and neighborhood. Superregional centers are the largest type of shopping center, built around at least three major depart-

ment stores, not less than 100,000 square feet each, and usually contain more than 1 million square feet of gross leasable area. JAMES D. VERNOR & JOSEPH RUBIANSKI, SHOPPING CENTER APPRAISAL AND ANALYSIS, at 10–11 (1993). Regional malls are built around one or two anchor stores which

Loudoun County has identified three sites which would be appropriate for regional shopping centers: the Lerner site, the Dulles 28 site, and the Nattak site. However, the two other parcels identified by Loudoun County are currently being developed. The Dulles Town Center (the Lerner property), will be a superregional mall consisting of 1.2 million square feet. The Dulles 28 center is being developed along the lines of a power center, and already has a number of committed stores.

Utilizing the methodology for a marketability analysis,[21] CMF's analyst stated that the demand for retail space was a function of population and income; shopping malls must have customers (represented by the population) and those customers must have buying power (income). Loudoun County's income levels are sufficient to support all three shopping centers, but the population projections may prove to be problematic. Lennhoff stated that the sources he cited publish guidelines as to the population criteria necessary to sustain the various shopping center sizes. A typical drive radius is estimated for a mall by looking at required population, typical acreage, number of stores, gross leasable area, drive distance and drive time. From that drive radius, a primary trade area may be identified. Approximately 60–70 percent of the mall's customers will come from the primary trade area. Lennhoff estimated the population of Loudoun County to determine whether there is support for three shopping malls (two regional and one superregional center). He concluded that although the population of Loudoun county is growing, the population within an eight mile radius (representing the primary trade area) is insufficient to develop three shopping centers of this size in the area. Lennhoff clearly stated, and agreed with Wise, that the site itself is an outstanding site. However, timing plays an important role in development and currently, Nattak is the "odd-man out". It will take time, five to seven years, for market conditions to change so as to favor developing the proposed power center on the Nattak site.

Opposing counsel posed the suggestion to CMF's expert that instead of being competing malls, the three malls planned in Loudoun County would be complimentary. Using the example of Potomac Mills,[22] counsel inquired as to why the 28 Corridor could not take the same development route. Lennhoff stated that the development of the two sites could not be compared. First, Potomac Mills is located off of Interstate 95, the main thoroughfare to Florida, whereas the property in question is located off of Route 7. Based on location alone, the Nattak site simply would not receive as many shoppers as Potomac Mills. Second, given the population forecasts, the existing infrastructure of the other two malls, and the fact that Nattak has no committed tenants, the kind of positive dynamic that exists at Potomac Mills would not be recaptured in this situation. Although Lennhoff noted that enough stores exist to fill both Nattak and the Dulles 28 regional mall, the Principal of Intervening Opportunities will control at this particular time in development.[23] In this case, customers would need to pass the superregional mall,

---

are surrounded by lots of smaller tenants, and typically range from 400,000 to 750,000 square feet of gross leasable area. *Id.* at 10. Community centers are built around either a junior department store, variety store, or discount department store and usually include a supermarket. These malls may range in size from 150,000 to 300,000 square feet of gross leasable area. *Id.* A power center, like the one envisioned by Nattchase, is a hybrid of the community and regional centers. The power center is somewhere between community and regional in size, with four or more big anchors surrounded by a few, if any, smaller stores. Transcript at 124.

21. Lennhoff relied on a textbook used in marketability analysis course and the most recent textbook by the Appraisal Institute.

22. Potomac Mills is a highly successful, 2 million square foot shopping center, located off of Interstate 95. A number of smaller malls have been developed around Potomac Mills, and rather than competing with Potomac Mills, these sites have prospered because of, rather than in spite of, the larger mall.

23. According to Lennhoff, the Principal of Intervening Opportunities is a basic concept in shopping center market analysis, which states that a customer will not pass a dominant center to reach a second center without cause. Transcript at 118.

and the Dulles 28 mall, to get to the Nattak site and Lennhoff simply could not find any reason to justify such behavior. Lennhoff concluded that a power center concept would be ideal for the Nattak site, but not for at least seven years.

The ability of the Steeplechase property to generate income appears to be even more grim than that of the Nattak site. The parties presented meager testimony as to the marketability of the Steeplechase parcels as compared to the in depth analysis given for the Nattak site. Representative of Nattchase indicated that the partnership has spent approximately $100,000 to market and promote the Steeplechase § II parcel as a corporate office park, but this effort has been stifled by the depression in the real estate market. According to testimony, the market is slowly improving, and Nattchase has seen some increased interest in these properties in the past few months. Nattchase offered testimony from a representative of the Carlyse Group, a merchant bank which had been solicited to bid on the portfolio CMF purchased from the RTC. The Court is satisfied that the Carlyse Group has had substantial investment dealings with Brown, individually and as an investor, and may have some interest in these properties. However, the Carlyse Group is still researching and analyzing the property and will not be able to make a commitment, if any, for over two months.

Nattchase officials anticipate the Steeplechase § III site to be the most lucrative of the Steeplechase sites, and expect no difficulty in obtaining approval for the rezoning of the area for residential use. At this time the application is inactive. Other than statements by Nattchase officials, no evidence was offered by the debtor supporting the contention that the rezoning application would be approved. CMF's analyst studied the current status of the Steeplechase § III property when estimating the highest and best use of the property, and came to a different conclusion. Relying on discussions with Loudoun County planners, Lennhoff stated that residential zoning is unlikely even if the application is activated because Loudoun County discourages residential land-use within the 28 Corridor. Transcript at 110. It is evi-dent to this Court that the Steeplechase properties are undeveloped land in a sagging real estate market. Despite efforts by the debtor to contribute substantial funding to market and rezone the properties, their efforts cannot combat both the market conditions and Loudoun County. Clearly the status of the Steeplechase sites supports a finding that Nattchase is not meaningfully moving toward a reorganization, and that no reorganization is in prospect.

The Court finds that at the very minimum, the Nattchase property could not be income producing for at least three years and at the latest, seven. All evidence before the court indicates that there has been a substantial depression in the real estate market in the Loudoun County area, and any growth is only in the beginning stages. Further, there is no indication that Nattchase has any concrete interest from investors seeking to purchase or invest in the development of the area.

The Court finds credible Lennhoff's testimony regarding the marketability of the property and the future development of the Nattak site as a power center. The Nattak site is definitely the "odd man out". In light of the two competing malls and the population expectations of the Loudoun County area in question, it appears to the Court that timing is, unfortunately, not on the side of Nattchase. Even if Nattchase completed a power center on the Nattak site within the next few years, that mall would definitely be marred by the existence of the other existing superregional and regional malls. We cannot find that the Nattak site will be income producing within the near future. Furthermore, there appear to be no realistic development and growth expectations for the Steeplechase sites. This Court cannot conclude that an inactive application to rezone, coupled with three parcels of largely undeveloped land will meet the lofty expectations of the debtor sufficient to constitute a reorganization *that is in prospect.* The debtor is a single asset real estate partnership that owns nothing but undeveloped land that is generating expenses, and has no hope of generating income for a number of years. In short, this Court is satisfied that there is no reasonable

possibility that Nattchase will be able to successfully reorganize.

Has this showing come within
a reasonable time?

Since the debtor has been unable to demonstrate that there is a reasonable possibility of reorganization so as to satisfy the standard as set forth in *Timbers,* there is no need for this Court to determine whether this showing has come within a reasonable time.

In conclusion, we find that CMF is entitled to relief from the automatic stay under both § 362(d)(1) and (d)(2). Based upon the foregoing, it is ADJUDGED, ORDERED and DECREED that the movant, CMF Loudoun Limited Partnership, is entitled to and is hereby granted relief from the automatic stay.